[No. B118920. Second Dist., Div. Three. Aug. 20, 1998.]

OLD REPUBLIC INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
NAUTILUS INSURANCE COMPANY, Real Party in Interest.

[No. B118923. Second Dist., Div. Three. Aug. 20, 1998.]

FIRST GENERAL INSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
NAUTILUS INSURANCE COMPANY, Real Party in Interest.

**COUNSEL**

Roper & Folino and Joseph L. Stark for Petitioner Old Republic Insurance Company.

Horvitz & Levy, Barry R. Levy, H. Thomas Watson, Federman & Gradwohl, Alan J. Gradwohl, Berman, Berman & Berman, Ronald S. Berman and Mark E. Lowary for Petitioners First General Insurance Company et al.

No appearance for Respondent.

White & Case, Bryan A. Merryman, Christopher W. Kelly and Ryan L. Roney for Real Party in Interest.

## OPINION

**CROSKEY, J.**—In these consolidated writ proceedings, petitioners Old Republic Insurance Company (Old Republic) (No. B118920) and First General Insurance Company (First General) and Colonial Penn Insurance Company (Colonial) (No. B118923) (collectively, petitioners) ask us to direct the trial court to enter summary judgment in their favor on a complaint for contribution and indemnification filed by the real party in interest, Nautilus Insurance Company (Nautilus). This case arose after Nautilus was found to be liable to provide a defense and indemnity to its insureds with respect to certain third party multiyear claims which had been asserted against them. Petitioners had also issued liability policies to the same insureds but, unlike Nautilus, they had denied coverage and refused to participate in a defense. By this action, Nautilus seeks to compel petitioners to contribute to the cost of the insureds' defense and indemnity which Nautilus has been required to provide. Petitioners moved for summary judgment on Nautilus's complaint on the ground that there was never any potential for coverage under the policies which they had issued to the insureds. When the trial court denied petitioners' motions, they petitioned this court for a writ of mandate.

We conclude that petitioners' denial of coverage was legally correct and there was never any potential for coverage under their liability policies. Therefore, petitioners cannot be liable to Nautilus for contribution or indemnification even though (1) petitioners' policies are substantially identical to the policy which Nautilus issued, and (2) there is a final judicial determination that coverage did exist under Nautilus's policy.[1] We hold that petitioners are not bound by that judicial determination because they were neither

---

[1] We recognize that our conclusion as to coverage is inconsistent with the reasoning and holding of another division of this district. However, we believe our interpretation and construction of the relevant policy language, when examined in accordance with settled principles, compels the result we reach.

parties nor privies to the prior proceeding. We therefore will issue the requested writ relief.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

This case begins with, and ultimately turns upon the obligations created by, a written commercial lease agreement. On December 8, 1981, Golden Crest, Inc., as lessor, entered into the lease with Arnold, Alfred and Sherri Schlesinger (the Schlesingers), as lessees. The Schlesingers maintained possession of the commercial lease premises located at 8300 Sunset Boulevard in Los Angeles, from February 1, 1982, until January 31, 1991. During that period of time, the Schlesingers operated a retirement home business at this location under the fictitious business name of Goldencrest Retirement Hotel.

The Schlesingers allegedly failed or refused to perform their obligations under the lease and, on or about October 6, 1992, the lessor filed an action[3] seeking damages against the Schlesingers for (1) breach of the lease agreement, and (2) waste (hereinafter, the underlying action). The lessor also sought an accounting for unpaid percentage rentals which were due under the lease. In the complaint, the lessor alleged that the Schlesingers had breached the lease in a number of particulars by (1) failing to pay the required minimum and percentage rentals beginning in September of 1990,[4] (2) failing and refusing to keep and maintain the leased premises (including described furniture, furnishings and fixtures) in good order, condition and repair and, upon the surrender of the leased premises (which in fact took place on January 31, 1991), to return them to the lessor in the same condition as when received, ordinary wear and tear excepted, clean and free of debris with all damages repaired,[5] (3) failing to comply with all applicable laws and ordinances, (4) failing to keep the premises free of liens, encumbrances,

---

[2]The facts which we recite are not in dispute. The issues which we are asked to decide involve only questions of law.

[3]The plaintiffs in that action were Irving Feld, Judith Feld, Henry Feld, Toya Feld, Michael Travrig and Jeffrey Feld. They are the successors in interest to the original lessor, Golden Crest, Inc., a dissolved corporation. For the sake of simplicity and ease of reference, we include these plaintiffs in our use of the term "lessor."

[4]The exact amount of unpaid rental which was due would be determined in the accounting requested by the lessor.

[5]The lessor specifically alleged in the complaint that the Schlesingers had during the lease term "caused extensive damage to the Property including, but not limited to, damage to the ceilings, floors, fixtures and carpets caused by, among other things, deterioration of the roof and the failure and/or refusal to maintain the premises, and the failure to replace such items; damage to the air lines, power panels, lighting fixtures, plumbing and hearing and cooling systems caused by, among other things, the failure and/or refusal to repair or maintain the premises: damage to wall surfaces and carpets caused by, among other things, the failure and/or refusal to properly clean, repair or maintain the premises; damage to the swimming

claims and levies, (5) failing to timely pay real property taxes assessed upon the leased premises, and (6) entering into one or more subleases without the lessor's prior consent.

The lessor sought recovery of damages for these breaches of the lease in the sum of $426,000 in unpaid minimum rent, plus percentage rent found to be due pursuant to the accounting, together with interest, late charges and attorney fees.[6] For the damages to the real and personal property, the lessor sought recovery of $1.4 million, plus such additional sums as might be proven at trial. With respect to such damage claims, the lessor also included a third cause of action for waste. In that count, the lessor alleged that the above described breaches of the lease caused damage to the lessor in that "the value of the Property as an established retirement hotel has been diminished; the Property is in such severe need of repair that it is virtually worthless to the Plaintiffs; Plaintiffs are required to pay monthly rental for the Property to their loss and detriment; and Plaintiffs will be required to repair the Property so as to bring it back to the physical state in which it existed and to replace the furniture, furnishings and equipment. Plaintiffs are presently unaware of the full amount of damage which has been caused as a direct and proximate result of the acts of Defendants, and each of them, but are informed and believe and thereupon allege that such amount is in excess of One Million Eight Hundred Thousand Dollars ($1,800,000)."[7]

The foregoing detailed summary of the charging allegations of the complaint filed against the Schlesingers in the underlying action is directly relevant and necessary to our consideration of the insurance coverage issues raised by these consolidated writ petitions. As we emphasize below, all of

---

pool and pool area caused by, among other things, the failure and/or refusal to repair or maintain the premises, all to Plaintiffs' damage in a sum which will be proven at trial but which plaintiffs are informed and believe, and thereupon allege, is in excess of one million four hundred thousand dollars ($1,400,000)."

The lessor made similar allegations with respect to damage done to leased furniture, furnishings and fixtures. It was alleged that the Schlesingers "failed to keep the furniture, furnishings, fixtures and equipment remaining, installed in or attached to the property; failed to keep the furniture, furnishings, fixtures and equipment free and clear of claims, levies, liens, encumbrances and process; parted with possession of, disposed of or removed all or part of the furniture, furnishings, fixtures and equipment; failed to keep the furniture, furnishings, fixtures and equipment in good condition and/or failed to make all necessary repairs; and failed to replace the furniture, furnishings, fixtures and equipment with new items, all to plaintiffs' damage in an amount which is presently unknown but which will be proven at trial."

[6]Under the express terms of the lease, "[a]ny monetary obligations of Lessee to Lessor under the terms of this lease shall be deemed to be rent."

[7]It was also alleged that such acts of waste were "done intentionally and maliciously" and the lessor was entitled to recover treble damages under Code of Civil Procedure section 732.

the lessor's claims arise from or depend upon the lease agreement and the Schlesingers' alleged breach thereof. The Schlesingers carried liability insurance with at least four different insurers during the leasehold period.[8]

For purposes of the questions presented to us, each of these policies contained substantially the same language.[9] The policies promised that "the company will pay on behalf of the insured all sums that the insured *shall become legally obligated to pay* as damages because of . . . property damage to which this insurance applies caused by an *occurrence. . . .*" (Italics added.) *Occurrence* was defined to mean "an accident, including continuous or repeated exposure to conditions, which results in . . . *property damage* neither expected nor intended from the standpoint of the insured." *Property damage* was defined to mean "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the policy period." The foregoing represents the insuring clauses which are relevant to the issues before us. Those clauses also included the promise to provide a defense for "any suit against the insured seeking damages on account of such . . . property damage, . . ."

The policies also contained certain exclusions. Two of those exclusions are of particular importance to us. With respect to the first of these, the policies provided that the promised insurance coverage did *not* apply "to liability assumed by the insured under any contract or agreement *except an incidental contract. . . .*" (Italics added.) An *incidental contract* was defined to mean "any written (1) *lease of premises,* (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal

---

[8]First General provided coverage for the periods September 17, 1981, to September 17, 1982 (policy No. GL4842) and September 17, 1982, through September 17, 1983 (policy No. SMP16750); Colonial covered May 1, 1985, to May 1, 1988 (policy No. DE00571); Old Republic provided coverage for December 23, 1986, to December 23, 1987 (policy No. Z48711) and December 23, 1987, to December 23, 1988 (policy No. ML11311); and finally, Nautilus covered the period December 20, 1988, to December 20, 1989 (policy No. L64208).

There is some suggestion in this record that this policy history may not be an accurate reflection of Colonial's period of coverage and that its policy may have been canceled at some time prior to May 1, 1988. However, such uncertainty as to policy duration is not important in light of the result which we reach. Also, we recognize that some portions of the leasehold period do not appear to have been covered by liability insurance. Whether this was in fact the case or the insurers involved, for one reason or another, simply are not parties to this action, we cannot determine from the record before us.

[9]As we read the briefs submitted by the parties, they have effectively agreed that we may treat the recitation of relevant policy language set for in this opinion as the language utilized in *each* of the above described policies.

ordinance except in connection with work for the municipality, (4) sidetrack agreement or (5) elevator maintenance agreement." (Italics added.) An endorsement to the policies extended the definition of an *incidental contract* to "include any contract or agreement relating to the conduct of the insured's business, . . ." (Italics added.)[10] The second relevant exclusion provided that the insurance would not apply to "property damage to (1) property *owned* or *occupied by* or *rented to* the insured, . . ." (Italics added.)[11]

The Schlesingers tendered defense of the underlying action to each of the four insurers. All denied coverage and all refused a defense except Nautilus which, on November 30, 1992, agreed to provide a defense, but only under a reservation of rights.[12] On January 29, 1993, although Nautilus was then providing a defense to the underlying action, the Schlesingers filed an action against Nautilus for declaratory relief to determine the issue of coverage. On March 11, 1993, Nautilus filed its own declaratory relief action and named both the Schlesingers and their former lessor as defendants. These two

---

[10]This endorsement extension of the "incidental contract" definition was, however, limited by the immediately following language:

"(B) The insurance afforded with respect to liability assumed under an incidental contract is subject to the following additional exclusions:

"(1) to bodily injury or property damage for which the insured has assumed liability under any incidental contract, if such injury or damage occurred prior to the execution of the incidental contract;

"(2) if the insured is an architect, engineer or surveyor, to bodily injury or property damage arising out of the rendering or the failure to render professional services by such insured, including

"(a) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs specifications, and

"(b) supervisory, inspection or engineering services;

"(3) if the indemnitee of the insured is an architect, engineer or surveyor, to the liability of the indemnitee, his agents employees, arising out of

"(a) the preparation or approval of or the failure to prepare or approve maps, drawings, opinions, reports, survey change orders, designs or specifications, or

"(b) the giving of or the failure to give directions or instructions by the indemnitee, his agents or employees, provide such giving or failure to give is the primary cause of the bodily injury or property damage;

"(4) to any obligation for which the insured may be held liable in an action on a contract by a third party beneficiary for bodily injury or property damage arising out of a project for a public authority; but this exclusion does not apply to an action by the public authority or any other person or organization engaged in the project.

"(5) to bodily injury or property damage arising out of operations, within 50 feet of any railroad property, affecting a railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing; but this exclusion does not apply to sidetrack agreements."

[11]One or more of these policies had a broad form endorsement modifying this exclusion, but in a manner which is immaterial to the questions presented to us.

[12]Nautilus had initially advised the Schlesingers (by letter dated November 9, 1992) that it would not provide a defense. However, after an exchange of correspondence with counsel for the Schlesingers, Nautilus reversed its position and agreed to provide a defense subject to its right to contest coverage.

actions were subsequently consolidated (hereinafter, the coverage action). Neither of these two complaints named any of the petitioners as defendants nor were they ever made parties to either action by cross-complaint or otherwise.[13]

On March 31, 1994, following the completion of certain discovery matters, Nautilus moved for summary judgment in the coverage action. In essence, it argued that (1) the claims made against the Schlesingers in the underlying action were based entirely upon an alleged breach of contract and did not constitute an "accident" resulting in "property damage," and (2) the exclusions relating to (a) liability assumed by contract, and (b) property damage to property owned, occupied or rented by the insured applied and precluded coverage. The trial court granted the motion. However, on November 4, 1996, another division of this district, in a brief unpublished opinion, reversed (*Schlesinger* v. *Nautilus Ins. Co.,* (Nov. 4, 1996) B085908). That court held that the policy language defining an "incidental contract" as including a written lease was sufficient to justify coverage. The opinion emphasized that the underlying action sought recovery for damage to the leased premises which allegedly occurred in violation of the terms of the lease. Since "the Schlesingers purchased insurance coverage for property damage stemming from a breach of a written premises lease," Nautilus was obligated to provide that coverage. Nautilus's arguments regarding (1) the limited scope and application of the incidental contract language, (2) the failure of the claimed breach to satisfy the policy's requirement of an "occurrence," and (3) the preclusionary effect of the "owned property" exclusion all were summarily rejected.[14] The summary judgment in favor of Nautilus was reversed.

---

[13]However, the record reflects that a cover letter from the Schlesingers, dated June 25, 1993, forwarding copies of the two First General policies, and sent to counsel for First General, advised that "there is an existing Declaratory Relief Action pending to determine coverage and other issues *with regard to one of the other policies.*" (Italics added.) The record does not contain any evidence that either Old Republic or Colonial was ever made aware of the pendency of the coverage action prior to its conclusion.

[14]In its opinion, the appellate court responded to Nautilus's arguments: "Nautilus's argument makes no sense. The insurance policy by its own terms covers the insured's liability for property damage under written lease of premises agreements, as 'incidental contracts' are defined. In this instance, there was a written lease agreement in which Nautilus's insured expressly assumed liability for maintaining the leased premises in a proper condition. The underlying lawsuit alleges that the Schlesingers breached the lease by failing to maintain the premises, which resulted in extensive property damage. If the only claim made in the underlying lawsuit was for unpaid rent and an accounting, Nautilus would not be liable. However, because the underlying lawsuit seeks a recovery for property damage resulting from a breach of the lease, this coverage applies."

The opinion recognized that this result appeared to be in direct conflict with the "owned property" exclusion. However, it resolved that conflict in the following manner: "An exclusion in the policy for damage to 'property owned or occupied or rented to the insured' does

Following remand to the trial court, Nautilus settled the coverage action with the Schlesingers and, on April 23, 1997, filed the pending action against the petitioners for (1) contribution, (2) equitable indemnity, and (3) declaratory relief. It is not entirely clear from the record, but Nautilus suggests in its complaint that the underlying action has not yet been resolved and Nautilus is going forward with a defense and has become "obligated to pay, and will incur and pay extensive costs in defending and indemnifying the [Schlesingers] in the underlying action." In addition, Nautilus alleges that it will be obligated to pay all consequential damages with respect to the coverage action including fees and costs pursuant to *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796].[15] As counsel for Nautilus argues, "the theory of the complaint is simple: if, as [the appellate court] concluded, coverage exists under Nautilus' policies, it must also exist under the functionally identical policies issued by petitioners. The complaint alleges that petitioners failed to defend or indemnify the Schlesingers, that Nautilus was obliged to bear the entire burden of defense and indemnity costs itself, and that petitioners are liable for equitable contribution and indemnity. The complaint seeks *pro rata* contribution of *both* defense and indemnity costs."

On October 28 and 29, 1997, petitioners filed three separate motions for summary judgment on Nautilus's complaint. In making those motions, petitioners essentially presented the same arguments to the court which Nautilus had advanced when it had made a similar motion in the coverage action. On December 17, 1997, the trial court denied all three motions, relying on the same reasoning adopted by the appellate court in the coverage action when it reversed the judgment previously granted to Nautilus. Since the relevant language in each of petitioners' policies was the same as that in Nautilus' policy, the trial court concluded that the result should be the

---

not cancel out the coverage for damage under a written lease. If we attempt to reconcile the two exclusions, we arrive at the following analysis: The 'owned or occupied or rented' exclusion would apply in the absence of a lawsuit by the landlord for breach of the insured's responsibilities under the lease, but not otherwise. So if, for example, some furniture at the leased premises was negligently broken by the insured, the insured could not make a claim against the insurer to have the furniture replaced. On the other hand, where, as here, the insured has been sued for breach of his duty under the lease to properly maintain the furniture, the incidental contract coverage comes into play. [¶] It may well be that the two exclusions cannot be reconciled, and are, quite simply, in direct conflict with each other. The policy gives coverage for property damage resulting from a breach of 'any written . . . lease of premises.' And, it excludes coverage for damage to 'property owned or occupied or rented to the insured.' Nautilus cannot simultaneously include and exclude property damage covered by a written lease of premises agreement."

[15]We note here that the *Brandt* case imposes such a burden *only* in bad faith cases (see *Brandt* v. *Superior Court, supra,* 37 Cal.3d at p. 817) and the coverage action does not appear to have involved a bad faith claim.

same.[16] Petitioners then sought timely writ relief. We consolidated the two petitions which were filed and, on March 23, 1998, issued an order to show cause, stayed all further proceedings in the trial court and set the matter for hearing.

## ISSUES PRESENTED

Essentially, there are three issues presented for resolution. First, is there any potential for coverage under petitioners' policies given the undisputed facts and allegations in the relevant pleadings? Second, even if there is no potential for coverage, are petitioners nonetheless bound under the doctrine of collateral estoppel by the now final decision in the coverage action? Finally, even if the petitioners are not bound by the final judgment in the coverage action, did that decision raise an unresolved issue as to coverage so as to impose upon petitioners a duty to defend until they could conclusively establish noncoverage as to *their* policies? We answer all of these questions in the negative.

## DISCUSSION

### 1. *Standard of Review*

Summary judgment is properly granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) After examining documents supporting a summary judgment motion in the trial court, this court independently determines their effect as a matter of law. (*Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) The moving party bears the burden of establishing, by declarations and evidence, a

---

[16]The trial court clearly had some concern about this case. After listening to the argument of counsel the court stated, ". . . there are times when the system is better served if trial judges don't shoot at appellate courts and say, 'These people are idiots; they don't know what they're doing; they've made a mistake.' [¶] Or where one division of the court of appeal says, these people in this other division are idiots and we don't agree with them. . . . [¶] . . . As far as I'm concerned, the cases are substantially identical, that which they decided, and the case I have before me, in terms of the legal issues. I recognize that the party alignment is different because I don't have the insured here. [¶] So with that interesting and scholarly discussion, I'm denying the three motions I have before me. I will sign an order or orders reflecting that denial. But I want the order or orders very, very, very, very, very narrowly limited."

In its written order, the trial court made it clear that its denial of the motions for summary judgment was based upon two assumptions: (1) that the appellate opinion in the coverage action "correctly stated" the applicable law and (2) the relevant provisions of petitioners' policies were, "for the purpose of this motion," materially the same as the relevant provisions of Nautilus's policy.

complete defense to plaintiff's action or the absence of an essential element of plaintiff's case. (*Bacon* v. *Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 858 [62 Cal.Rptr.2d 16], *Westlye* v. *Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1726-1727 [22 Cal.Rptr.2d 781]; Code Civ. Proc., § 437c, subd. (o).)

" '[An] issue of fact becomes one of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion. [Citation.]' [Citation.]" (*Preach* v. *Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1450 [16 Cal.Rptr.2d 320].) ■ The interpretation of a policy of insurance, which is the principal task presented to us by this appeal, is a question of law which we resolve de novo. (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) In order to do this, it is necessary that we first briefly review the applicable principles of insurance policy construction.

### 2. General Principles of Insurance Policy Construction

■ In *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253], the Supreme Court set forth the basic rules which must guide our interpretation of any policy of insurance. Those rules are based upon statutes dealing with the interpretation of contracts generally. (*Id.* at p. 822.) The mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (Civ. Code, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage" (Civ. Code, § 1644), will control judicial interpretation. (Civ. Code, § 1638.)

The Supreme Court amplified on these principles two years later in its decision in *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545], where it stated that "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. . . . The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. . . . If contractual language is clear and explicit, it governs. . . . On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' . . . This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, *the objectively reasonable expectations of the insured.*' . . . Only if this rule does not resolve the

ambiguity do we then resolve it against the insurer. . . . [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. . . . This is because *'language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.'* " (*Id.* at pp. 1264-1265, first italics added, citations omitted.)

Thus, the *Bank of the West* court made it clear that it was no longer enough to find an abstract ambiguity or a meaning for a disputed word or phrase which was simply "semantically permissible."[17] In order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's *objectively reasonable expectations.* (*Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) In order to do this, the disputed policy language must be examined *in context* with regard to its intended function in the policy. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265.) This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and "common sense." (*Id.* at p. 1276.) Such an evaluation of an insured's *objectively* reasonable expectations under that criteria may result in a restriction of coverage rather than an expansion. (*Sequoia Ins. Co.* v. *Royal Ins. Co. of America* (9th Cir. 1992) 971 F.2d 1385, 1390 [applying California law].) An insured will not be able successfully to claim coverage where a reasonable person would not expect it. (See, e.g., *La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 41-43 [36 Cal.Rptr.2d 100, 884 P.2d 1048]; *Farmers Ins. Exchange* v. *Knopp* (1996) 50 Cal.App.4th 1415, 1423 [58 Cal.Rptr.2d 331]; *A.C. Label Co., Inc.* v. *Transamerica Ins. Co.* (1996) 48

---

[17]Prior to the decision in *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807, the rule of construction was much more liberal. If *any* ambiguity existed in an insurer-drafted policy, it was to be construed in favor of the insured, and an ambiguity could be demonstrated if the meaning of the disputed term or phrase as advocated by the insured was "semantically permissible." (See, e.g., *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269, fn. 3 [54 Cal.Rptr. 104, 419 P.2d 168]; *Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; *Harris* v. *Glens Falls Ins. Co.* (1972) 6 Cal.3d 699, 701 [100 Cal.Rptr. 133, 493 P.2d 861]; *Insurance Co. of North America* v. *Sam Harris Constr. Co.* (1978) 22 Cal.3d 409, 412-413 [149 Cal.Rptr. 292, 583 P.2d 1335]; *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764]; *White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal.Rptr. 509, 710 P.2d 309].) Since *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807 and *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, the emphasis is on *context* and the *objectively* reasonable expectations of the insured.

Cal.App.4th 1188, 1194 [56 Cal.Rptr.2d 207]; *Cooper Companies* v. *Transcontinental Ins. Co., supra,* 31 Cal.App.4th at p. 1104.)

### 3. *General Principles of Coverage Analysis*

■ When determining coverage under an insurance policy, we must *first* look to the insuring clause, that is, to the policy language which promises coverage. In this case, for example, the relevant insuring clause promised to "pay on behalf of the insured all sums that the insured *shall become legally obligated to pay* as damages because of . . . property damage . . . caused by an occurrence. . . ." (Italics added.)

As the Supreme Court recently put it, *"Before 'even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms].'* [Citation.] 'This is significant for two reasons. First, ". . . when an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded." [Citation.] [¶] Second, although exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage.' [Citation.]" (*Waller* v. *Truck Ins. Exchange, supra,* 11 Cal.4th at p. 16, italics added.)

In other words, if the insuring clause does not cover a claimed loss, then there is no coverage. (*Stanford Ranch, Inc.* v. *Maryland Cas. Co.* (9th Cir. 1996) 89 F.3d 618, 627; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1997) ¶ 4:40.5, p. 4-11.) In such a circumstance, there is no need to consider policy exclusions because exclusions serve to limit coverage granted by an insuring clause and thus apply only to hazards *covered* by the insuring clause. (*Ibid.*) An exclusion cannot act as an additional grant or extension of coverage. (*St. Paul Fire & Marine Ins. Co.* v. *Coss* (1978) 80 Cal.App.3d 888, 896 [145 Cal.Rptr. 836]; *Stanford Ranch, Inc.* v. *Maryland Cas. Co., supra,* 89 F.3d at p. 626.)

■ Insuring clauses are interpreted broadly in favor of the insured in order to protect the objectively reasonable expectations of the insured. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 667 [42 Cal.Rptr.2d 324, 913 P.2d 878].) Exclusionary clauses, on the other hand, are construed strictly against the insurer. (*Delgado* v. *Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 271 [203 Cal.Rptr. 672].) The function of an exception to an exclusionary clause is to give back coverage taken away by the exclusion. Thus, an exception to an exclusion is somewhat analogous

to a coverage provision which, as noted, is to be construed broadly. (*National Union Fire Ins. Co.* v. *Lynette C.* (1991) 228 Cal.App.3d 1073, 1082 [279 Cal.Rptr. 394].) Nonetheless, there is no cure for a lack of coverage under the insuring clause. Even if the effect of an exception is to render a particular exclusion inoperative, the insured must still prove the loss is covered. "Ordinarily, an exception to a policy exclusion does not create coverage not otherwise available under the coverage clause." (*Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 540 [12 Cal.Rptr.2d 629]; *St. Paul Fire & Marine Ins. Co.* v. *Coss, supra,* 80 Cal.App.3d at p. 896.)

With these principles in mind, we now turn to an examination of the coverage dispute before us and the meaning and effect to be given to the relevant insuring clause, the two exclusions and the "incidental contract" exception to one of them.

### 4. *Petitioners' Liability Policies Do Not Provide Coverage for Breach of Contract*

In its essence, Nautilus's argument echoes the reasoning expressed by the appellate court in its decision in the coverage action. It may be summarized as follows. Because the policies have an exclusion for contractually assumed liability, a reasonable policyholder might conclude that, but for that exclusion, there would be coverage. Therefore, since "incidental contracts" are deemed exceptions to that exclusion, a reasonable policyholder arguably might conclude that there was coverage for any liability "assumed" under such a contract. In other words, an ambiguity is created by the juxtaposition of the insuring clause, the contractually assumed liability exclusion and its exception for incidental contracts. Since the Schlesingers incurred liability under a lease agreement and the definition of an "incidental contract" included a written lease, the policy should be construed in their favor and coverage found. We reject this argument as superficial and contrary to proper coverage analysis. It is also founded upon a perception of an ambiguity which really does not exist.

The relevant insuring clause consists of a promise to pay all sums which the Schlesingers shall become *legally obligated to pay as damages* because of *property damage* caused by an *occurrence*. If the claims asserted against the Schlesingers in the underlying action do not fall within the scope of that promise, then there is no coverage and we do not need to reach or consider either (1) the contractually assumed liability exclusion or its exception for "incidental contracts," or (2) the owned, occupied, or rented property exclusion. (*Hurley Construction Co.* v. *State Farm Fire & Casualty Co., supra,* 10

Cal.App.4th at p. 540.) In our view, the analytical error made by the appellate court in reversing Nautilus's summary judgment in the coverage action was its treatment of the "incidental contract" exception as though it were an insuring clause, that is, as a promise to pay damages due under a written lease from any property damage caused by the insured. This constituted an unfortunate rewriting of Nautilus's policy.

In this case, the key term is "legally obligated." That has been repeatedly held to refer to liabilities *imposed by law*; that is, *tort* liability as opposed to contract liability. (*Wilmington Liquid Bulk Terminals, Inc.* v. *Somerset Marine Inc.* (1997) 53 Cal.App.4th 186, 193 [61 Cal.Rptr.2d 727]; *Bernstein* v. *Consolidated American Ins. Co.* (1995) 37 Cal.App.4th 763, 771-772 [43 Cal.Rptr.2d 817]; *Fireman's Fund Ins. Co.* v. *City of Turlock* (1985) 170 Cal.App.3d 988, 995 [216 Cal.Rptr. 796].) ▮ "Courts have interpreted policy language covering sums the insured becomes 'legally obligated to pay' . . . as referring to tort liability, because it describes liability based upon a breach of a duty imposed by law, rather than by contract. [Citations.]" (*Wilmington Liquid Bulk Terminals, Inc.* v. *Somerset Marine Inc.*, *supra*, 53 Cal.App.4th at p. 193.) Given the settled construction which the courts have given the term "legally obligated," we can only conclude that its use is clear and unambiguous and its application must exclude from its embrace any coverage for contractual liability generally. This conclusion is consistent with and is reinforced by those cases which have construed "contractual liability" endorsements.[18] They have been held to cover only tort liabilities of *another person* which an insured assumes by contract. (*Loyola Marymount University* v. *Hartford Accident & Indemnity Co.* (1990) 219 Cal.App.3d 1217, 1225-1226 [271 Cal.Rptr. 528].) Such endorsements do *not* cover the insured's liability for breach of contract. (*Bernstein* v. *Consolidated American Ins. Co.*, *supra*, 37 Cal.App.4th at pp. 771-772.)

As the court in *Loyola Marymount University* put it, " '[t]he contractual liability [coverage] endorsement provides coverage only when there is tort liability. More specifically, the endorsement covers third party tort liabilities that the insured assumes by contract. It does not cover damages suffered by a third party as the result of the insured's breach of a contract entered into with that party.' These principles have been restated and applied consistently in [a number of] California cases . . . [all of which] hold that 'contractual liability' coverage does not extend to the insured's breach of contract."

---

[18]For example, a common contractual liability endorsement would expand the term "legally obligated" to include the insured's contractual liability, but only with respect to *liability of others* for such damages assumed by the named insured under a contract which became binding and effective before such damages were sustained. (See, e.g., *Bernstein* v. *Consolidated American Ins. Co.*, *supra*, 37 Cal.App.4th at p. 771.)

*(Loyola Marymount University* v. *Hartford Accident & Indemnity Co., supra,* 219 Cal.App.3d at p. 1226, fn. omitted.) Such " 'coverage is limited to the insured's contractual assumption of another's *tort* liability, ordinarily by way of a "hold harmless" agreement, and does not extend to liability arising *ex contractu.*' " (*Id.* at p. 1226, fn. 6, original italics.)

■ However, such an express "contract liability" endorsement is not included in the relevant policy provisions before us. Indeed, there is a specific exclusion for *any* liability assumed by contract. A conclusion that coverage existed under petitioners' policies when it would be denied under policies with the very same exclusions but which *expressly expanded* the scope of the insuring clause would be anomalous indeed. More precisely, and contrary to the implicit conclusion in the coverage action, the contractually assumed liability exclusion in petitioners' policies and its exception for "incidental contracts," *when read in context*, does not render the scope or reach of the insuring clause ambiguous.

Any exclusion must necessarily relate only to coverage promised in the insuring clause, that is, damages caused by an occurrence for which the insured becomes "legally obligated." Therefore, an exclusion from a coverage promise described as "any liability assumed by contract" must refer to a preclusion of coverage from the *same kind* of exposure contemplated by the insuring clause. In other words, the exclusion logically and reasonably can relate only to the assumption of tort, not contract, liability and since it is "assumed" rather than imposed by law, it must be the tort liability *of another*. Thus, the exception for "incidental contracts" can only refer to contracts which involve the assumption of a third party's tort liability. This interpretation is supported by an examination of the entire policy, particularly the language relating to "incidental contracts" (see fn. 10, *ante*, and related discussion). A reading of the policy as a whole makes it clear that this is the "intended function" of this exception. Any other interpretation of this exclusion and its "incidental contract" exception simply would not be objectively reasonable. It would convert a liability policy into a performance bond and would result in coverage for breach of contract claims. This is not the purpose or function of a liability policy. It must therefore follow that agreements recognized as "incidental contracts" are those which involve, in some form or manner, a promise by the insured to "assume" or be liable for the tortious acts of another.

In this case, however, the liability which is at issue is not tort liability nor does it relate to an assumption of the liability of another. It is the Schlesingers' own *contractual* liability which they incurred when they executed and then subsequently breached the written lease agreement. A lease is a contract. (*Medico-Dental etc. Co.* v. *Horton & Converse* (1942) 21 Cal.2d 411,

418-419 [132 P.2d 457].) Its breach will give rise to a claim for contract damages. (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 575, p. 752 ["The measure of damages for breach of a lease is that established by C.C. 3300 for breach of contract"].) When a lessee breaches a lease, "[t]he lessor may recover, in addition to past and future rentals . . . 'Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom.' ([Civ. Code, §] 1951.2, subd. (a)(4).) This is the ordinary rule of damages for breach of contract under [Civil Code, section] 3300. . . . [¶] Examples of such damages are the lessor's reasonable expenses in retaking possession of the property, *in making repairs that the lessee was obligated to make,* in preparing the property for reletting, and in reletting; also damages for the *lessee's breach of covenants, such as a covenant to maintain or improve the premises, or a covenant to restore them on termination of the lease.* (Law Rev. Com. Comment to [Civ. Code, §] 1951.2.) [Citation.]" (4 Witkin, Summary of Cal. Law, *supra,* Real Property, § 679, p. 867, italics added.)

Therefore, to the extent that the claims against the Schlesingers in the underlying action constituted claims for breach of contract, they did not come within the insuring clause of petitioners' policies and there was no coverage. Nor, as the foregoing discussion demonstrates, can coverage be justified by reliance on the exceptions to the contractually assumed liability exclusion. As we have shown, coverage cannot be based on the language of an exception to an exclusion. (*Hurley Construction Co.* v. *State Farm Fire & Casualty Co., supra,* 10 Cal.App.4th at p. 540.) Moreover, even if we were to look to such language, coverage could not be sustained because the claims against the Schlesingers involve their alleged breach of contract, not an obligation to assume the tort liability of another.

Nonetheless, Nautilus asks us to endorse the earlier reasoning of the appellate opinion in the coverage action which resulted in the conclusion that the policy language contained a promise to pay for "the insured's liability for property damage under written lease of premises agreements." For all of the reasons discussed above, we cannot do that. The policies contain no such commitment either in their insuring clauses or in the wording of their exclusions.[19]

---

[19]In fairness, Nautilus tried to point this out to the court, but its arguments were rejected as making "no sense" (see fn. 14, *ante*). Unfortunately, the appellate court misread the policy, failed to distinguish between insuring and exclusionary clauses and did not appreciate the proper legal characterization which has consistently and repeatedly been given to the term

## 5. *Coverage Cannot Be Based Upon the Claim of Waste*

Nautilus next argues that one of the counts in the underlying action did involve a tort claim; the third cause of action was for waste. Based on those allegations, Nautilus contends, a potential for coverage existed, requiring the petitioners to provide a defense. We reject that contention for two alternative reasons.

■ First, waste is defined as "an unlawful act or omission of duty on the part of a tenant, resulting in permanent injury to the [property]." (61 Cal.Jur.3d, Waste, § 1, p. 591; *Southern Pacific Land Co.* v. *Kiggins* (1930) 110 Cal.App. 56, 60-61 [293 P. 708].) In order to state a cause of action for waste, a plaintiff must plead and prove that the defendant was under a duty to preserve and protect the property involved. (61 Cal.Jur.3d, Waste, § 3, pp. 592-593.) "An individual owner in fee simple absolute may use property in any lawful way he desires, but the owner of a lesser estate, or any other legal possessor of land, must use it in such a manner as to avoid waste." (4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 420, p. 604.) "To constitute waste, there must be an injury to the inheritance ([Civ. Code, §] 818), substantially depreciating the market value of the property." (*Id.* at § 421, p. 605.) As the Supreme Court has explained, " '[W]aste is conduct (including in this word both acts of commission and of omission) on the part of the person in possession of land which is actionable at the behest of, and for protection of the reasonable expectations of, another owner of an interest in the same land. . . . Thus, waste is, functionally, a part of the law which keeps in balance the conflicting desires of persons having interests in the same land.' [Citation.]" (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 597-598 [125 Cal.Rptr. 557, 542 P.2d 981]; see also *Smith* v. *Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 775-776 [184 Cal.Rptr. 308].)

■ Thus, to the extent that the Schlesingers were under a duty not to commit waste, it could only be based upon the written lease. It was by that instrument that the Schlesingers had the necessary interest in the land upon which their exposure for waste was based. It was the breach of that lease which was the subject of the first two counts in the underlying action. ■ "Where the sole basis of the insured's potential liability is a claim that the insured breached a contractual duty, it cannot be transformed into a breach of a duty imposed by law simply by an allegation that the breach was also tortious, . . ." (*Wilmington Liquid Bulk Terminals, Inc.* v. *Somerset Marine Inc., supra,* 53 Cal.App.4th at p. 194; see also *Stanford Ranch, Inc.* v.

---

"legally obligated." As a result, Nautilus is in the position of losing both sides of the same argument. It was right the first time. Through no fault of its own, it is now faced with trying to defend the indefensible in its arguments before us.

*Maryland Cas. Co., supra,* 89 F.3d at pp. 624-625, 627; *Fragomeno* v. *Insurance Co. of the West* (1989) 207 Cal.App.3d 822, 831 [255 Cal.Rptr. 111]; *Insurance Co. of the West* v. *Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1317 [241 Cal.Rptr. 427]; disapproved on another ground in *Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 50, fn. 12 [65 Cal.Rptr.2d 366, 939 P.2d 766].) ▮▮ Thus, the action for waste, depending as it does on the lease contract for the creation of the duty which was breached, may be considered as a claim upon a contract. As such, for all of the reasons already discussed, there is no coverage.

Alternatively, even if the waste action is deemed to be tortious in nature, and assuming arguendo that it might thereby be covered under the policy's insuring clause, there would still be no coverage because of the "owned, occupied or rented" *exclusion.* On its face, this exclusion unambiguously precludes coverage for any claim for property damage to property occupied or rented to the Schlesingers. Since that is precisely what the underlying action was about, this exclusion would preclude coverage in any event.

The comments made by the appellate court in the coverage action that this exclusion had limited application and was perhaps irreconcilable with the "coverage" provided under the "incidental contract" exception do not reflect proper policy analysis. Even assuming that the court had properly concluded that the "incidental contract" provision was relevant, it would only have the effect of limiting the preclusionary impact of the *contractually assumed liability exclusion.* It would have no impact on the operation of any other exclusion. In other words, if an insurer contests coverage based on its assertion that two separate exclusions apply and it turns out that only one of them actually does, the insurer still prevails. The applicability of one effective exclusion is sufficient to preclude coverage irrespective of the inapplicability of other exclusions also relied upon by the insurer.

Thus, we conclude that, given the contractual nature of the waste claim asserted in the underlying action, it does not fall within the coverage promised under the policies' insuring clause. Even if it did, it would be excluded by the "owned, occupied or rented" exclusion.

▮▮ Nautilus next argues that even assuming that it is correct to conclude that there was no potential for coverage for the claims asserted in the underlying action and the prior appellate holding was wrong, that judgment is now final. It squarely held that coverage *did* exist under the language which is common to all of the policies involved. That now final judicial determination should be binding on the petitioners and collaterally estop them from denying coverage. To hold otherwise, Nautilus argues, would be unfair and would compound an injustice. We now turn to this issue.

### 6. *Petitioners Were Not Parties or Privies to the Coverage Action and Therefore Are Not Collaterally Estopped to Deny Coverage*

 The collateral estoppel or issue preclusion aspect of res judicata does not operate as a complete bar to subsequent litigation. Rather, under collateral estoppel, issues that have been fully and fairly litigated and determined between the parties are regarded as conclusively determined in subsequent litigation. (*Passanisi* v. *Merit-McBride Realtors, Inc.* (1987) 190 Cal.App.3d 1496, 1510 [236 Cal.Rptr. 59]; *Harman* v. *Mono General Hospital* (1982) 131 Cal.App.3d 607, 614-615 [182 Cal.Rptr. 570].) The resolved issue may or may not be determinative in subsequent litigation, depending upon its importance to the cause of action, but where collateral estoppel applies the parties will not be permitted to relitigate the previously determined issue. (*Branson* v. *Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, 346 [29 Cal.Rptr.2d 314].)

In general, the threshold requirements for application of collateral estoppel are: (1) the issue sought to be precluded must be identical to that decided in prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the issue must have been necessarily decided in the prior litigation; (4) the decision in the prior litigation must be final and on the merits; and (5) the party against whom preclusion is sought must be the same as or in privity with, the party to the prior litigation. (*Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995]; *Branson* v. *Sun-Diamond Growers, supra,* 24 Cal.App.4th at p. 346.)

 Petitioners argue that this test has not been met in this case; the fifth requirement has not and cannot be established. Petitioners point out that they were not parties to the coverage action; indeed, there is no evidence in this record that two of the three petitioners even knew about the pendency of that action.[20] Nautilus responds that petitioners were nonetheless in privity with it and are therefore bound by the final judgment determining that the policy language common to all of the policies does provide coverage. To

---

[20]However, we do not rely on such circumstance. We understand that evidence of knowledge of the pendency of the coverage action on the part of all three petitioners may exist or, at least, Nautilus believes that it does. Since Nautilus has not yet had an opportunity to complete discovery on the question of petitioners' actual awareness of such circumstance, it would be inappropriate to consider endorsing petitioners' right to summary judgment if our decision were grounded on their claimed lack of contemporaneous knowledge of the pendency of the coverage action. We therefore assume, for purposes of this opinion, that petitioners were in fact aware of the coverage action and the issues it raised at the time it was pending. The record does reflect, however, that the petitioners were never in fact made parties to the action by either Nautilus or the Schlesingers; nor did they seek to intervene.

support this argument, Nautilus relies primarily upon two cases which have recognized and applied an "expanded" notion of privity: *People* ex rel. *State of Cal.* v. *Drinkhouse* (1970) 4 Cal.App.3d 931, 937 [84 Cal.Rptr. 773] (*Drinkhouse*) and *Ceresino* v. *Fire Ins. Exchange* (1989) 215 Cal.App.3d 814, 821-822 [264 Cal.Rptr. 30] (*Ceresino*).

The court in *Drinkhouse* said that under the modern doctrine of collateral estoppel, ". . . the word 'privy' has acquired an expanded meaning. The courts, in the interest of justice and to prevent expensive litigation, are striving to give effect to judgments by extending 'privies' beyond the classical description. [Citation.] The emphasis is not on a concept of identity of parties, but on the practical situation. The question is whether the non-party is sufficiently close to the original case to afford application of the principle of preclusion." (4 Cal.App.3d at p. 937.) In *Drinkhouse,* Tax Collector Weber had conveyed certain land to Drinkhouse and one Rutledge; Rutledge then conveyed to one Harbet. After Weber and Rutledge had been convicted of improperly transferring land in which they had a financial interest, the state sought to quiet title to the land because the contracts of sale were void *ab initio*. Drinkhouse and Harbet, arguing that they were neither parties nor privies to the criminal action against Weber and Rutledge, sought to avoid the collateral estoppel application of the criminal judgment to their defense of their deeded interest in the land. They argued that they had never had their day in court or had any opportunity to produce or cross-examine witnesses with respect to the legality of their grantors' actions; nor did they have the right to their own counsel or to appeal the judgment determining that their grantors' actions were illegal, which determination had the ultimate consequence of voiding their deeds. This argument was rejected by the *Drinkhouse* court, which emphasized that Drinkhouse and Harbet could not be allowed to relitigate issues already decided. To allow them to do so would, if they prevailed, cause "several anomalies unsettling to public confidence in the judicial process [to] appear" (*Id.* at p. 938.) Weber would still stand convicted and have served a sentence for a transaction found to be legal in a subsequent civil action. The same deed found invalid as to Rutledge would be valid as to Drinkhouse. Avoidance of such a result was found by the *Drinkhouse* court to be a sufficient circumstance to justify the conclusion that the criminal judgment was binding under the doctrine of collateral estoppel.

Nautilus argues that this analysis and reasoning have been extended to insurance cases in order to avoid contradictory coverage conclusions. (*Ceresino, supra,* 215 Cal.App.3d 814.) *Ceresino* arose out of a fight between the insured Ceresino and the third party claimant who filed suit to recover damages for the injuries which he sustained in the fight. Ceresino stipulated to entry of judgment against him solely on the claimant's cause of action for

negligence; the claimant's assault and battery count was dismissed. The insurer, which had denied coverage, relying upon the intentional acts exclusion, sued Ceresino and the third party claimant for declaratory relief. However, Ceresino was dismissed from the declaratory relief action, after which the court entered judgment in favor of the insurer, finding no coverage as to the third party claimant. Ceresino then sued the insurer, contending he was not estopped by the prior declaratory relief judgment because he was not a party to the action. The *Ceresino* court rejected that contention and held that the prior judgment bound the insured even though he was not a party to the declaratory relief action. Relying heavily on *Drinkhouse*, the court concluded, "[i]f collateral preclusion is not honored here, and somehow judgment were entered for Ceresino, that judgment would be inconsistent with the judgment entered in the declaratory relief action. The first judgment established no coverage under Ceresino's policy and therefore no duty on Farmer's part to indemnify. A subsequent judgment for Ceresino would have to be based on the opposite conclusion. This is the very situation sought to be avoided by the expanded definitions of privity. Consequently, collateral preclusion, in this instance, must be affirmed to discourage repetitive litigation, to prevent inconsistent judgments, and to discourage vexatious litigation. [Citations.]" (*Id.* at pp. 821-822.)

In our view, Nautilus's reliance on *Drinkhouse* and *Ceresino* is misplaced. Indeed, both cases present factual circumstances significantly different from what we have here. *Drinkhouse* involved a criminal conviction of Drinkhouse's *grantor* which resulted in the legal determination that Drinkhouse's deed was invalid. Furthermore, as the validity of his title depended upon the validity of the actions of *his* grantor, he was clearly a successor in interest. It does not take a very broad view of the term "privy" to conclude that Drinkhouse's action should be precluded. Moreover, to allow him the opportunity to relitigate in a subsequent civil action the same factual questions upon which his grantor's deed had been found to be illegal would serve no purpose but mischief. The court's analysis of the public policy concerns which would be raised by the recognition of a contrary civil conclusion were entirely correct.

Here, unlike *Drinkhouse*, we do not have a disputed factual matter which was thoroughly litigated by a predecessor in interest with a very substantial motive to succeed (and who effectively litigated under an even lower proof burden, as he would have been entitled to a not guilty verdict if there was any reasonable doubt as to the truth of the criminal allegations against him). What we are faced with in this case is a disputed question of law as to which the prior appellate court erred. None of the policy concerns discussed in *Drinkhouse* apply here save the specter of the injustice which will result to Nautilus. However, this is a circumstance which we could avoid only by

compounding the prior legal error through its imposition upon petitioners. The old adage about "two wrongs do not make a right" comes quickly to mind.

In *Ceresino*, the insured, although not a party to the declaratory relief action from which he had been dismissed and which resulted in a determination of no coverage, had a strong interest in the resolution of that issue and was very much tied to the third party claimant's interests. The third party's claim was based on a stipulated judgment which provided that the third party could not settle or compromise that judgment claim with the insurer without resolution of the declaratory relief action *in favor of coverage* or without Ceresino's written authorization. In other words, in order to preserve his own right to pursue the bad faith claim which he later in fact filed, Ceresino retained some control over the third party's conduct of the declaratory relief action. In addition, Ceresino was a witness in the case and his attorney was present at the hearing. Thus, there was ample basis for the court's conclusion that Ceresino was a privy in the declaratory relief action and bound thereby. We have no such facts here.

■ Whatever may be the scope of "expanded notions of privity," it is clear that collateral estoppel may only be applied where due process requirements are met. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 875 [151 Cal.Rptr. 285, 587 P.2d 1098].) " 'In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.' [Citations.] The 'reasonable expectation' requirement is satisfied if the party to be estopped had a proprietary interest in and control of the prior action, or if the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for the party to be estopped. [Citations.] Furthermore, due process requires that the party to be estopped must have had a fair opportunity to pursue his claim the first time. [Citation.]" (*Lewis* v. *County of Sacramento* (1990) 218 Cal.App.3d 214, 218 [266 Cal.Rptr. 678].) These tests were met in both *Drinkhouse* and *Ceresino*; they are not satisfied here.

■ In the case before us, the most that can be said of petitioners is that they had an "interest" in the outcome of the coverage action in that they doubtless hoped that Nautilus would prevail, as that would produce a result which would have been binding on the Schlesingers. Indeed, Nautilus did prevail in the trial court. It was only on appeal that an adverse decision was realized. We do not see what incentive petitioners had to intervene. Why should they have had any reason to believe that they would or should be

bound by any adverse decision on coverage which might be handed down against Nautilus which result they had absolutely no reason to anticipate? They did not have a financial or proprietary interest in the outcome of the coverage action. (See Code Civ. Proc., § 1908, subd. (b).) Nor can it fairly be said that Nautilus was in any way acting as the representative of petitioners; certainly, petitioners had no control over, or impact on, the coverage action. In addition, petitioners would have had no reason to anticipate that the failure of Nautilus to sustain its summary judgment, due to an appellate opinion that is patently erroneous,[21] would ultimately serve as a basis for denying them an opportunity to litigate the issue of coverage under their own policies with their own counsel articulating the legal arguments which they deemed controlling. Finally, such an *offensive* use of the doctrine of collateral estoppel as Nautilus attempts here is not favored. (*White Motor Corp.* v. *Teresinki* (1989) 214 Cal.App.3d 754, 763 [263 Cal.Rptr. 26]; see generally, 7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, §§ 412-415, pp. 987-994.)

For all of these reasons we believe that no basis exists for holding petitioners bound by the final judgment in the coverage action.

### 7. *No Potential for Coverage Was Created by the Prior Appellate Decision*

▉ Nautilus's final argument is, in effect, that the prior appellate decision, even though arguably erroneous, and even though not legally binding on petitioners, demonstrated the existence of a *potential* for coverage under the identical policies issued by petitioners. As a result of such coverage potential, a duty existed on petitioners' part to provide a defense. Nautilus therefore contends that, until the issue of coverage *under their policies* was finally resolved, the petitioners owed the Schlesingers a defense. The duty to provide that defense, Nautilus argues, is sufficient to support its claim for contribution at least with respect to those defense costs incurred or expended during the period prior to a conclusive determination of noncoverage under petitioners' policies.

This argument would have merit if the issue of coverage depended on an unresolved factual dispute. When coverage depends on an unresolved factual dispute then a potential for coverage exists until the insurer can conclusively establish in a judicial proceeding that there is no coverage. (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; *Haskel, Inc.* v. *Superior Court* (1995) 33 Cal.App.4th 963, 976-977 [39 Cal.Rptr.2d 520].)

---

[21]The records of this district indicate that review by the Supreme Court of the appellate decision rendered in the coverage action was never sought. This was obviously a tactical choice by Nautilus and its counsel in which petitioners could play no part.

However, when, as here, coverage depends upon an unresolved *legal* question the rule is otherwise. "[W]here the only potential for liability turns on resolution of [a] legal question, there is no duty to defend." (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 25-26; *A-Mark Financial Corp.* v. *CIGNA Property & Casualty Companies* (1995) 34 Cal.App.4th 1179, 1191-1192 [40 Cal.Rptr.2d 808].) In this case, as we stated at the outset, the question of coverage under petitioners' policies depends on the interpretation and construction of policy language. This involves solely a legal issue. (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18; *Masonite Corp.* v. *Great American Surplus Lines Ins. Co.* (1990) 224 Cal.App.3d 912, 916 [274 Cal.Rptr. 206].) There are no unresolved factual disputes. Our determination that there is no coverage as a matter of law means that there *never* was any potential for coverage under petitioners' policies. The earlier erroneous decision in the coverage action affected only Nautilus and does not alter our conclusion. Petitioners thus never owed any duty to defend the Schlesingers and therefore have no duty to contribute to defense costs incurred by Nautilus nor to indemnify it for any of its expenditures incurred to defend or indemnify the Schlesingers. (*United Pacific Ins. Co.* v. *Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 936 [266 Cal.Rptr. 231].)

### DISPOSITION

The order to show cause heretofore issued, having served its purpose, is discharged. A peremptory writ shall issue in these consolidated proceedings directing the trial court to vacate its order of December 17, 1997, denying petitioners' motions for summary judgment and to enter a new and different order granting the same. The stay of proceedings in the trial court which we heretofore issued shall be dissolved as of the date of our issuance of the remittitur herein. Petitioners shall recover their costs.

Klein, P. J., and Aldrich, J., concurred.

On September 9, 1998, the opinion was modified to read as printed above.