[No. F051091. Fifth Dist. Aug. 2, 2007.]

ESSEX INSURANCE COMPANY, Plaintiff and Respondent, v.
CITY OF BAKERSFIELD, Defendant and Appellant.

**COUNSEL**

Marderosian, Runyon, Cercone, Lehman & Armo, Stephen T. Knudsen and Ovidio Oviedo, Jr., for Defendant and Appellant.

Wright, Robinson, Osthimer & Tatum, David V. Rose, Christiane E. Cargill and Vickie V. Grasu for Plaintiff and Respondent.

**OPINION**

**HILL, J.—**

### INTRODUCTION

Appellant City of Bakersfield (the City) appeals from a judgment in favor of respondent Essex Insurance Company (Essex) that held that Essex did not

owe the City a duty to defend or indemnify it in a related lawsuit, *Navarro v. Fulamex-1, Inc.* (Super. Ct. Kern County, 2005, No. S-1500-CV-254712) (*Navarro*). The *Navarro* lawsuit arose from an automobile accident that allegedly was caused by a dangerous condition resulting from an event organized by the City. Essex had issued an insurance policy covering this event. The *Navarro* accident did not occur on the premises of the event, and the drivers of the vehicles involved in the accident were not employees or agents of the City or of any insured. The trial court interpreted an insurance contract provision that specifically excluded coverage for " 'bodily injury' or 'property damage' arising out of, caused by or contributed to by the owner-ship, non-ownership, maintenance, use or entrustment to others of any 'auto' " as barring coverage for the *Navarro* lawsuit. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Accident*

On October 15, 2004, at approximately 6:44 p.m., an automobile accident occurred on State Route (SR) 119. The accident involved drivers Guillermo Mena and Gloria Navarro.

On the night of the accident, the City was beginning its annual D.A.R.E. (Drug Abuse Resistance Education) "Fright Night" fundraising event. Fright Night took place in a cornfield maze on private property just south of SR 119. The entrance to the Fright Night parking lot was on Buena Vista Road, approximately two-tenths of a mile from the accident site. The exit of the Fright Night parking lot had a "right turn only" sign, and allowed cars to exit eastbound onto SR 119.

Bakersfield Police Officer Luis Arvizo was assigned to monitor the north end of the Fright Night parking lot. His duties included monitoring volunteers who were parking cars for the event and acting as a deterrent when people would approach the "right turn only" sign to exit onto SR 119. Officer Arvizo was not assigned to direct traffic.

Officer Arvizo testified that he saw a white van traveling eastbound on SR 119 and merging onto the right shoulder, near the "exit only" driveway of the Fright Night parking lot. Officer Arvizo motioned to the white van to continue traveling eastbound.

Guillermo Mena was driving his Freightliner tractor with semitrailer eastbound on SR 119 at approximately 55 miles per hour just east of Buena Vista Road. Mena saw the white van ahead of him, and started to apply the brakes. According to Mena, he did not see any signal lights to indicate it was

stopped or if it was going to make a turn. Mena applied his brakes because he could not tell at what distance the white van was, or if it was stopped or about to make a turn. After applying the brakes, Mena's tractor-trailer jackknifed causing the tractor-trailer to travel into the westbound lane of SR 119, colliding with Gloria Navarro's automobile.

Mena was unaware of any event taking place south of SR 119 before the accident. He did not see any signs for the Fright Night event. He did not see any traffic leaving the event. He did not see any signs directing traffic for Fright Night. He also did not see anyone directing traffic in the area prior to the accident.

California Highway Patrol Officer R. ValVerde determined that Mena caused the collision in violation of Vehicle Code section 22107 (unsafe turning movement) coupled with Vehicle Code section 22350 (unsafe speed for conditions).

The operators of the vehicles involved in the subject accident were neither employees nor agents of the City. Moreover, the vehicles involved in the subject accident were not owned, operated or maintained by the City.

B. *The* Navarro *Lawsuit*

On January 26, 2005, Gloria, Jose and Erick Navarro filed a civil complaint against Guillermo Mena and his employer, Fulamex-1, as well as several Doe defendants in Kern County Superior Court. The complaint alleged that defendants negligently caused a semitrailer to collide with their truck, causing injuries and loss of consortium.

On March 16, 2005, the Navarros filed a claim under Government Code section 910 et seq. for injuries to Gloria and loss of consortium to Jose sustained on October 15, 2004. The claim alleged that "[o]n October 15, 2004, the City of Bakersfield dba The Bakersfield Police Department D.A.R.E. Program hosted an event on Taft Highway near Buena Vista Road known as 'Fright Night Field of Screams.' The event was so carelessly, negligently and recklessly located, managed, designed and provided with traffic control so as to cause or contribute to plaintiff's [sic] Gloria Navarro being struck head-on in her own lane of travel by a big rig truck operated by Fulamex One. The actions or inactions of the City of Bakersfield in locating, managing, designing and providing controls at this location were a direct and proximate cause of plaintiff's injuries."

After the City denied the plaintiffs' claim pursuant to Government Code section 910 et seq., the *Navarro* plaintiffs sought leave to file an amended

complaint in the civil action, in order to substitute D.A.R.E., Inc., and the City as Doe defendants. Leave was granted on June 14, 2005.

The operative second amended complaint in the *Navarro* lawsuit alleges that "Defendants, DARE, INC. and CITY OF BAKERSFIELD, breached their duty of care to plaintiffs . . . when they created a dangerous condition during the DARE, Inc. Halloween Fright Night Event that contributed to the traffic accident that caused serious bodily injuries to plaintiffs . . . , thereby directly and proximately causing the damages complained of herein to plaintiffs. By placing the heavily traveled Fright Night Event on a major highway, and by providing dangerous and inadequate traffic controls, signage, and traffic direction, defendants DARE, INC. and CITY OF BAKERSFIELD were a proximate cause of plaintiffs' injuries."

### C. *The Insurance Policy*

Essex had issued a commercial general liability (CGL) insurance policy, No. 3CP0807, covering occurrences during the special event of Fright Night fundraising. The CGL policy was for a term of 15 days. The named insured was D.A.R.E., Inc. The City's police department was an "Additional Insured." The policy specifically excluded coverage for "Employer's Liability," "[A]uto," "Employment-Related Practices," "Pollution," "Asbestos, Lead or Silica Dust," "Punitive or Exemplary Damages," "Discrimination," "[C]ontractor, [B]uilder, or [D]eveloper," and "Professional Liability, Malpractice."

The form insurance policy used by Essex provided, under "2. Exclusions [¶] g. Aircraft, Auto or Watercraft," that the CGL policy would not cover the following: " 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and 'loading or unloading.' "

"Auto" was defined in section V—"Definitions," as "a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment."

The Essex insurance policy included an endorsement that modified the "auto" exclusion in "Exclusions" as follows:

"With respect to any 'auto,' under 2. Exclusions, g. Aircraft, Auto or Watercraft, Commercial General Liability Coverage Form, Section I. Coverages, the first paragraph is replaced by the following and applies throughout this policy:

"This insurance does not apply to 'bodily injury' or 'property damage' arising out of, caused by or contributed to by the ownership, non-ownership, maintenance, use or entrustment to others of any 'auto.' Use includes operation and 'loading and unloading.' "

The Essex CGL policy also contained a "SPECIAL EVENTS/SPECTATOR LIABILITY ENDORSEMENT," which provided in pertinent parts:

"The coverage under this policy does not apply to 'bodily injury', 'property damage', 'personal injury', 'advertising injury', or any injury, loss or damage arising out of: [¶] . . . [¶]

"5. Aircraft, aircraft landing strips, runways or any aircraft landing and/or takeoff area, passenger carrying balloons, *automobiles*, motorized land vehicles of any type, animals or animal rides, trampolines or mechanically operated amusement rides or devices." (Italics added.)

### D. *The Coverage Lawsuit*

On or about March 25, 2005, the City requested that Essex provide it with a defense and indemnity of the *Navarro* lawsuit. On May 27, 2005, Essex denied this request based upon the "auto" exclusion and the special events/spectator liability endorsement in the insurance policy. On July 25, 2005, the City once again demanded a defense and indemnity from Essex. On August 22, 2005, Essex reaffirmed its prior denial.

On August 23, 2005, Essex filed a complaint against the City seeking declaratory relief that it was not obligated to defend or indemnify the City in the *Navarro* lawsuit.

On March 28, 2006, Essex filed a motion for summary judgment. In its motion, Essex contended that it was entitled to declaratory relief because of the auto exclusions in the insurance policy. According to Essex, it is undisputed that the bodily injuries arose from an automobile accident on SR 119. Because the auto exclusions provide that the insurance policy does not cover liability for bodily injuries arising out of the use of automobiles, Essex asserted that "[i]n light of these Policy exclusions, the insured could not have any reasonable expectation of coverage for automobile accidents." Moreover, even if the City's negligence contributed to the accident, that negligence was not separate and apart from the use of an automobile to trigger coverage under the policy.

On June 5, 2006, the City filed its opposition to the summary judgment motion. The City argued that the auto exclusions only limit coverage of third

party claims that arise out of the use, maintenance, entrustment to others of autos by the City's agent or employees. Moreover, the Navarros alleged that the bodily injuries were caused by the City's creation of a dangerous condition, not by the City's use of an auto. The City also asserted that it reasonably expected coverage for the *Navarro* lawsuit. The City, by and through its employee Karen Bennett, had purchased the insurance policy via a broker. "When Mrs. Bennett purchased the Policy, she believed that it extended coverage for the creation of a dangerous condition as alleged in the *Navarro* lawsuit complaint. [Citation.] Mrs. Bennett was surprised when Essex Insurance Company denied the City defendants coverage, because she believed that anything pertaining to the cornfield maze would be covered."

On June 12, 2006, Essex filed its reply brief. In its reply, Essex contended that "[w]hile it is rare to find a case where a defendant is sued for an automobile accident when they had no connection with any of the vehicles involved, nevertheless, Essex was correct in denying coverage under the applicable insurance policy. . . . The policy does not state or even imply that the automobile exclusion is limited to third-party claims arising out of the insured's conduct." Essex contended that the modifications to the auto exclusion—the addition of the term " 'non-ownership,' " and the removal of the language " 'owned or operated by or rented or loaned to any insured' "—supported its interpretation of the auto exclusions. Essex also argued that the City was put on notice by a facsimile from the insurance broker to Karen Bennett and the insurance policy itself that bodily injury and property damage involving automobiles were strictly excluded from the policy.

On June 19, 2006, the trial court heard Essex's motion for summary judgment. On July 26, 2006, the trial court granted the motion in its entirety. The trial court concluded that Essex did not owe any duty or obligation to defend or indemnify the City under the insurance policy in connection with the *Navarro* litigation. The trial court based its decision on its finding that the damages in the *Navarro* lawsuit were the proximate result of an automobile accident that occurred on October 15, 2004; and that the Essex insurance policy did not provide coverage for bodily injury or property damage arising out of, caused by or contributed to by the ownership, nonownership, maintenance, use or entrustment to others of any automobile.

On August 15, 2006, the City timely appealed.

## STANDARD OF REVIEW

The grant of summary judgment is subject to de novo review. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].) Because the material facts here are undisputed, the interpretation of the insurance policy presents solely a question of

law. (*State Farm Mut. Auto. Ins. Co. v. Partridge* (1973) 10 Cal.3d 94, 100 [109 Cal.Rptr. 811, 514 P.2d 123] (*Partridge*).)

## DISCUSSION

### I.

### An Insurer's Duty to Defend

■ The City contends that Essex had a duty to defend the City in the underlying *Navarro* lawsuit. Under California law, "an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the *potential* for coverage under the insuring agreement." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619], italics added (*Waller*).) The nature and kinds of risks covered by the insurance policy establish the scope of the duty to defend. (*Ibid.*) "[I]f, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655 [31 Cal.Rptr.3d 147, 115 P.3d 460].) An insurer is also obligated to provide a defense even when an exclusion applies but may be reasonably interpreted to be inapplicable to the alleged facts. (*Smith Kandal Real Estate v. Continental Casualty Co.* (1998) 67 Cal.App.4th 406, 418 [79 Cal.Rptr.2d 52].) Thus, Essex has a duty to defend the City in the underlying *Navarro* lawsuit only if the insurance policy covers the claims alleged in that lawsuit. Essex argues that the auto exclusion provisions in the insurance policy exclude coverage for the *Navarro* lawsuit, and thus there was no duty to defend. We disagree with Essex's interpretation of those provisions.

### II.

### Interpretation of Insurance Policy

■ " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citation.]" (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568] (*Palmer*).) "Accordingly, in interpreting an insurance policy, we seek to discern the mutual intention of the parties and, where possible, to infer this intent from the terms of the policy." (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 [13 Cal.Rptr.3d 68, 89 P.3d 381] (*Haynes*).) "When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' [Citation.]

We must also interpret these terms 'in context' [citation], and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' " (*Palmer, supra,* 21 Cal.4th at p. 1115.)

█ "In the insurance context, 'we begin with the fundamental principle that an insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear.' " (*Haynes, supra,* 32 Cal.4th at p. 1204.) " ' "[A]ny exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." ' [Citation.] Coverage may be limited by a valid endorsement and, if a conflict exists between the main body of the policy and an endorsement, the endorsement prevails. [Citation.] But to be enforceable, any provision that takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain and clear.' [Citation.] Thus, any such limitation must be placed and printed so that it will attract the reader's attention. Such a provision also must be stated precisely and understandably, in words that are part of the working vocabulary of the average layperson. [Citations.] The burden of making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer. [Citations.]" (*Ibid.*)

## III.

### Essex Insurance Policy

A. *Coverage Provisions*

Essex issued a CGL insurance policy to the City that provided "third party" coverage. Third party coverage protects the insured against liability to another based on the insured's act(s). (*Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 399, fn. 2 [257 Cal.Rptr. 292, 770 P.2d 704]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 1:21, p. 1-7 (rev. #1, 2006) (hereafter Croskey).) The Essex insurance policy was a modified CGL form, No. CG 00 01 07 98, which indicates an Insurance Services Office (ISO) insurance coverage form with an occurrence trigger (CG 00 01) and an edition date of July 1998 (07 98). (See Croskey, ¶ 7:15, p. 7A-6.)

Under the policy's insuring clause, Essex promised to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Essex also promised "to defend the insured against any 'suit' seeking those damages." However, the coverage provisions also provided that Essex "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." The

coverage provisions also limited coverage for " 'bodily injury' " and " 'property damages' " to those caused by " 'occurrence[s]' " that take place in the " 'coverage territory.' "

The automobile accident in the underlying *Navarro* lawsuit is covered under the insuring clause in the Essex policy. The *Navarro* lawsuit alleged "bodily injury" proximately caused by a dangerous condition created by the Fright Night event. These allegations are sufficient to create a potential for coverage under the insuring agreement, thus triggering Essex's duty to defend the City. (See *Waller, supra*, 11 Cal.4th at p. 19.) Therefore, Essex must defend the City in the *Navarro* lawsuit unless an exclusion applies.

B. *Auto Exclusion Provisions*

The Essex policy contained numerous exclusions, of which two exclusions are at issue in this case. Under the policy's exclusion provisions, as modified by Essex, the CGL policy provided that: "This insurance does not apply to 'bodily injury' or 'property damage' arising out of, caused by or contributed to by the ownership, non-ownership, maintenance, use or entrustment to others of any 'auto.' Use includes operation and 'loading and unloading.' "

There was also a special endorsement that contained an automobile exclusion. Under a "SPECIAL EVENTS/SPECTATOR LIABILITY ENDORSEMENT," the policy provided that:

"The coverage under this policy does not apply to 'bodily injury', 'property damage', 'personal injury', 'advertising injury', or any injury, loss or damage arising out of: [¶] . . . [¶]

"5. Aircraft, aircraft landing strips, runways or any aircraft landing and/or takeoff area, passenger carrying balloons, *automobiles*, motorized land vehicles of any type, animals or animal rides, trampolines or mechanically operated amusement rides or devices." (Italics added.)

According to Essex, these two auto exclusions are applicable here because the "bodily injury" alleged in the *Navarro* lawsuit arose out of the "non-ownership" of an automobile by an insured or the "use" of an automobile by Gloria Navarro or Guillermo Mena. We disagree. Essex's interpretation of the auto exclusions converts those exclusions into unusual and unfair limitations of coverage that defeat the insured's reasonable expectations of coverage. (*Haynes, supra*, 32 Cal.4th at pp. 1210–1211.) Given that the record provides no evidence that Essex's broad interpretation of the auto exclusion provisions was brought to the attention of the insureds, we conclude that the auto

exclusions do not plainly and clearly preclude coverage of the *Navarro* lawsuit in context of the policy as a whole and in the circumstances of the case.

### C. *Provisions Limiting Coverage*

In *Haynes*, the California Supreme Court held that insurance contract provisions limiting coverage that are not conspicuous, plain and clear cannot defeat an insured's reasonable expectation of coverage as provided by the insuring clause. (*Haynes, supra,* 32 Cal.4th at p. 1215.) Here, the City reasonably expected that it would be covered for a lawsuit arising out of a claim that the City created a dangerous condition of public property. The auto exclusions here do not plainly and clearly limit coverage for the *Navarro* lawsuit, and thus cannot defeat the City's reasonable expectation of coverage.

The auto exclusions provide that there is no coverage for " 'bodily injury' or 'property damage' arising out of, caused by or contributed to by the ownership, non-ownership, maintenance, use or entrustment to others of any 'auto' " (the auto exclusion) or for any injury, loss or damage arising out of automobiles (the special events/spectator liability endorsement). Essex interprets these exclusions to limit coverage in any cases involving automobiles by anyone anywhere. However, no average layperson would have understood the auto exclusions in that manner.

The auto exclusions when viewed in the context of the insurance policy do not plainly and clearly exclude coverage for bodily injuries arising from automobile accidents where the insured had no connection to the automobiles involved. The language of the auto exclusions does not plainly and clearly provide that the auto exclusions would be applied in this manner. The modifications of the auto exclusion provision—the addition of the term "non-ownership" and the removal of the language "owned or operated by or rented or loaned to any insured"—do not plainly and clearly provide that there would be no coverage for cases involving autos that have no connection to the insured. The addition of the term "non-ownership" can be reasonably understood to replace the language "operated by or rented or loaned to any insured" given that vehicles that are rented or loaned to any insured are not vehicles that are owned by the insured. The removal of the term "owned" can be understood as avoiding duplication since the auto exclusion already limited coverage in cases arising out of the "ownership" of any autos. The auto exclusion in the special events/spectator liability endorsement is so vague that an average layperson would understand the exclusion as repetitive of the auto exclusion in the main insurance form with the possible inclusions of acts of spectators on the insured premises. Thus, an average layperson

would interpret the auto exclusions as applying to lawsuits involving the use of or other acts relating to any "auto" by any insured or on the insured premises.

Of course, the auto exclusions can be interpreted as Essex has done so, but that is an interpretation of the exclusions in the abstract, and not in the context of the policy or in the circumstances of this case.

Here, the City is being sued for creating a dangerous condition that contributed to an automobile accident. According to Essex, it would have provided coverage except that the accident involved automobiles that had no connection to the City. However, no public entity would have reasonably expected that the insurance policy would protect it from liability for negligently creating a dangerous condition of public property in all cases *except* where the dangerous condition leads to an automobile accident involving vehicles that had no connection to the public entity. Here, the City (and its agents and employees) did not own, operate, maintain, use, or entrust to others any of the automobiles involved in the accident. The accident did not even occur on the premises of the special event being insured. Thus, the City was reasonable in expecting that Essex would defend it from the claim that the City created a dangerous condition of public property that allegedly led to the automobile accident.

Moreover, when one examines the auto exclusions in the context of the other exclusions in the policy, one can readily deduce that the auto exclusions were meant to apply to those cases involving acts (or omissions) of the insured or its agents given that the other exclusions involve those types of situations. For example, the policy excludes coverage in cases of employer liability for acts done by employees in the course and scope of employment and employment discrimination by insured who are employers. The special events/spectator liability endorsement can be interpreted to exclude all such acts and omissions, as well as certain occurrences by spectators and third parties taking place on the premises of the events. The *Navarro* automobile accident, however, does not include these kinds of situations. The automobiles involved in the *Navarro* lawsuit had no connection to any insured. Moreover, the accident did not occur on the insured premises. There is not even any evidence that the drivers or automobiles involved were going to or leaving from the insured premises.

The unusual manner in which Essex is interpreting the auto exclusions is also reflected in the case law on auto exclusions. We are unaware of any case law or authority interpreting auto exclusion provisions in this manner. Rather, the cases addressing auto exclusions have all addressed situations where the automobile involved was owned, maintained, or used by an insured or an

insured's agent or employee. (See, e.g., *Partridge, supra,* 10 Cal.3d 94 [defendant accidentally shot plaintiff with a .357 magnum while operating his own vehicle]; *Safeco Ins. Co. v. Gilstrap* (1983) 141 Cal.App.3d 524 [190 Cal.Rptr. 425] [auto accident involved the negligent entrustment of defendant's motorcycle]; *Allstate Ins. Co. v. Jones* (1983) 139 Cal.App.3d 271, 277 [188 Cal.Rptr. 557] [auto accident caused by an insured's employee's negligence and the death of the passenger of the other car was caused by a negligently fastened rebar that was ejected from the insured's car's trunk]; *State Farm Fire & Cas. Co. v. Camara* (1976) 63 Cal.App.3d 48 [133 Cal.Rptr. 600] [plaintiff was injured while riding as a passenger in the defendant's modified dune buggy].)

■ Furthermore, such an interpretation of the auto exclusions does not comport with a common mode of interpreting exclusions in insurance contracts. When interpreting insurance policies, some commentators have argued that an exclusion limits or takes back some of the insurance coverage granted by the insuring clause. (Croskey, *supra,* ¶ 3:127, p. 3-40.) Therefore, "exclusions serve to limit coverage granted by an insuring clause and thus apply only to hazards *covered* by the insuring clause." (*Old Republic Ins. Co. v. Superior Court* (1998) 66 Cal.App.4th 128, 144 [77 Cal.Rptr.2d 642], disapproved on other grounds in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229].) If we analyze the Essex policy in this manner, the Essex policy covered the *Navarro* lawsuit. Under the insuring clause, Essex would provide third party coverage to the City for any liability arising out of the Fright Night fundraising event. However, the City was never liable for Guillermo Mena's negligent use of the tractor-trailer or for Gloria Navarro's use of her automobile. The reason was that neither driver was an employee or agent of the City, and the vehicles involved were not owned, maintained, operated or used by the City. Rather, the City is facing liability for allegedly creating a dangerous condition that proximately caused the accident. The Essex policy does not cover situations where the City is not liable. The auto exclusions "apply only to hazards *covered* by the insuring clause." (*Old Republic Ins. Co. v. Superior Court, supra,* 66 Cal.App.4th at p. 144.) Thus, the auto exclusions apply only in those cases where the City is liable for use of autos, which is not the case here.

■ Moreover, Essex's interpretation of the auto exclusions does not comport with the common understanding of auto exclusions in CGL policies. A CGL policy is intended to cover every risk that is not excluded. A CGL policy has a very broad insuring clause but also has numerous exclusions. Exclusions can be divided into two categories: "Certain exclusions are designed to avoid coverage for risks the insurer does not wish to insure at all; e.g., war, flood, intentional injury, environmental pollution, etc. Other exclusions are designed to limit coverage for risks *normally covered by other*

*insurance.*" (Croskey, *supra*, ¶ 3:128, p. 3-40.) The auto exclusion (as well as the aircraft and watercraft exclusions) is an exclusion designed to limit coverage for risks normally covered by other insurance. "To cover these risks, the insured must purchase separate insurance." (*Id.*, ¶ 3:129.1, p. 3-40.)

Thus, auto exclusions in CGL policies should not be interpreted to apply in cases where the insured cannot get separate insurance. We are unaware of any automobile insurance covering liability arising from an automobile accident where the insured has no connection to the automobiles involved in the accident. The likely reason is that there is no demand for such insurance. As Essex notes, it is rare for a defendant to be sued for an automobile accident when the defendant had no connection with any of the vehicles involved. The reason it occurred in this case was because the City allegedly created a dangerous condition of public property that led to the accident. In fact, we are not aware of *any* cases in which a person, who was not at fault for creating the circumstances leading to the accident, was found liable for an automobile accident where the person had no connection to the vehicles involved in the accident, such as using an involved vehicle, maintaining the vehicle, or owning the vehicle. Moreover, there would be no need for an automobile insurance policy covering an automobile accident where one has no connection to the vehicles involved because one would not suffer any loss, damage, or liability from the accident. (See Ins. Code, § 22 [insurance is "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event"].) Given that the City could not get separate automobile insurance for the accident in the *Navarro* lawsuit, the auto exclusions should not be interpreted to deny the City coverage for a claim alleging that the City created a dangerous condition of public property that contributed to the automobile accident.

Finally, we find that there is nothing in the record that would have put the City on notice that the auto exclusions would be interpreted in the manner that Essex did in this case. There was no case law or other authority that would have alerted the City to the fact that the auto exclusions would be interpreted in this manner. The facsimile by the insurance broker to Karen Bennett (stating that the insurance would not apply to "employers liability, aircraft, auto or water craft, employment related practice," etc.) and the language in the insurance policy did not plainly and clearly provide that coverage would not include lawsuits arising from a claim that the City created a dangerous condition where the dangerous condition led to an automobile accident involving vehicles that had no connection to the City. There was no additional language, provision or endorsement provided to the City explaining that Essex planned to interpret the auto exclusions more broadly than the typical understanding of such auto exclusion provisions.

Thus, the auto exclusions are not plain and clear enough to defeat the reasonable expectations of the City that it was covered for claims arising out of the creation of a dangerous condition of public property. Because the *Navarro* lawsuit made allegations that show a potential for coverage under the Essex CGL policy, Essex was required to defend the City in the underlying *Navarro* lawsuit.

## DISPOSITION

The judgment is reversed. The City shall recover its costs on appeal.

Vartabedian, Acting P. J., and Wiseman, J., concurred.

On August 27, 2007, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied October 31, 2007, S156269.