Filed 9/23/24  Castaneda v. The Interinsurance Exchange of the Automobile Club CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| MELANIE CELENE CASTANEDA et al., | D083070 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVSB2132933) |
| THE INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Winston Keh, Judge.  Affirmed.

Shernoff Bidart Echeverria, Michael J. Bidart, Ricardo Echeverria, Reid Ehrlich; Law Office of Fernando D. Vargas, Fernando D. Vargas; and Jeffrey Ehrlich for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Todd E. Lundell, John T. Brooks, Thomas R. Proctor and Michael Bean for Defendant and Respondent.

INTRODUCTION

Juvenal Hernandez and Melanie Celene Castaneda (together, plaintiffs) sued The Interinsurance Exchange of the Automobile Club (the Exchange) for breach of Hernandez's homeowner's policy and breach of the implied covenant of good faith and fair dealing. They alleged the Exchange wrongfully refused to provide Hernandez a defense or indemnification in a personal injury action brought by Castaneda for injuries she sustained from a pit bull attack.

The trial court granted the Exchange's motion for summary judgment, finding coverage was precluded by the policy's exclusion of claims of injury arising out of "the ownership of, custody of, or care for" a pit bull. On appeal, plaintiffs claim the court erred in entering summary judgment because the exclusion is fatally ambiguous, and there was a potential for coverage of at least one of Castaneda's claims. We reject plaintiffs' claims of error and conclude summary judgment was properly granted.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The* Castaneda *Action*

A.    *The Homeowner's Policy*

The Exchange issued a homeowner's policy to Hernandez providing that " 'You' or 'your' means any Named Insured in the declarations" and that "***Insured*** – means you and the following residents of your household," including "Your relatives by blood[.]" Hernandez was an insured under these provisions because he was the named insured in the declarations. Hernandez's sister, Dorian Hernandez,[1] lived in Hernandez's house as a renter, so she also qualified as an insured.

_____

[1]     To avoid confusion, we refer to Hernandez's sister as Dorian.

2

The policy provided personal liability coverage for "damages which any *insured* is legally liable to pay because of . . . *bodily injury* or *property damage* caused by an *occurrence*." "*Occurrence*" was defined in relevant part to mean "an accident . . . which, during the policy period, results in *bodily injury* or *property damage*." "*Bodily injury*," in turn, simply meant "bodily harm[.]" The policy further stated the Exchange would "defend any suit claiming damages for *bodily injury*[ or] *property damage* . . . to which this coverage applies. [The Exchange] will defend suit even if the allegations are groundless, false or fraudulent."

However, under exclusion "l" the policy excluded personal liability coverage for "*Bodily injury* or *property damage* arising out of the ownership of, custody of, or care for the following pure or mixed breed or pure or mixed type of dogs: [¶] (1) Any pit bull type of dog[.]" We will refer to this provision as the pit bull exclusion.[2]

B. *The Pit Bull Attack and Third-Party Lawsuit*

In November 2018, Dorian purchased a pit bull named "Bugzy." In May 2019, Dorian took Bugzy to a park that was about a half-mile away from Hernandez's house, where she allowed Bugzy to run off leash. As Castaneda walked past the park, Bugzy attacked Castaneda, biting and clawing her. Hernandez was driving his car on the freeway when the attack occurred.

In November 2019, Castaneda filed a complaint against Hernandez and Dorian seeking damages for the bodily injuries inflicted on her during the attack (*Castaneda* action). She asserted causes of action for (1) negligence;

---

[2]  The policy's definitions of "[i]*nsured*," "[o]*ccurrence*," and "[b]*odily* [i]*njury*" apply when those terms are "printed in *bold italic* type." Because there are no relevant instances in which the policy used these terms without the terms being printed in bold italic type, in the remainder of this opinion, we omit the original boldface and italics when quoting the policy.

3

(2) common law strict liability based on known dangerous propensities; (3) statutory strict liability based on the dog bite statute (Civ. Code, § 3342); and (4) negligence of owners or possessors of residential real property.

In support of her first cause of action, Castaneda alleged, among other things, that Hernandez and Dorian "were the owners, keepers, and harborers" of the dog that injured her. The allegations of the first cause of action were incorporated in each of the remaining causes of action. In the fourth cause of action, Castaneda alleged Hernandez and Dorian "were the owners, lessors, and managers of the premises where the [d]og bit [Castaneda]"; knew the dog was "vicious to people"; and had "control of the premises and the [d]og" and their failure "to do so" was the proximate cause of her injuries.

## II.

### *Plaintiffs' Coverage Action Against the Exchange*

In December 2019, Hernandez notified the Exchange of the *Castaneda* action. The Exchange conducted a coverage investigation during which it determined Bugzy was a pit bull; Bugzy was owned by Hernandez's sister Dorian, and Dorian lived with Hernandez; and the attack occurred when Dorian let Bugzy run unleashed in a local park. The Exchange then informed Hernandez that because Castaneda's injuries arose out of the ownership, custody, or care of an excluded dog breed, the policy did not cover Castaneda's claims.

Castaneda's counsel sent the Exchange two offers to settle the claims against Hernandez and Dorian for the policy's limit of liability ($500,000). An attorney representing Hernandez demanded that the Exchange accept the settlement offer and disputed its denial of coverage on the ground the exclusion was ambiguous as applied to Hernandez because the attack did not

4

arise from *his* ownership, custody, or care of the dog. In response, the Exchange disagreed the exclusion was ambiguous, reiterated its denial of coverage, and declined to pay the settlement demand.

In May 2021, Hernandez assigned Castaneda his rights against the Exchange in return for her agreement not to enforce any judgment entered against Hernandez or Dorian. On May 14, a default judgment against Hernandez and Dorian was entered in the *Castaneda* action in the amount of $7.5 million.

In November 2021, Hernandez and Castaneda (in her capacity as assignee) brought this action against the Exchange, asserting causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs alleged the Exchange had a duty to defend and indemnify Hernandez in the *Castaneda* action because the pit bull exclusion reasonably could be interpreted to apply "*only* if the **insured** owns, has custody of, or control over the particular dog in question," and Hernandez "did not own, have custody of, or control the dog that injured Castaneda."

## III.

### *The Exchange's Summary Judgment Motion*

The Exchange filed a motion for summary judgment on the ground there was no potential for coverage and thus no duty to defend Hernandez under the policy. It asserted that Hernandez's homeowner's policy broadly and unambiguously excluded liability coverage for bodily injuries "arising out of the ownership of, custody of, or care for . . . any pit bull type of dog." Because the injuries claimed by Castaneda were precisely the kind of injuries excluded by the policy, there was no potential for coverage and no duty to defend or indemnify Hernandez.

Plaintiffs opposed the motion on the ground the exclusion was ambiguous because it failed to specify whose ownership, custody, or care of an injury-causing pit bull would bring a claim within the exclusion. They argued the exclusion could be interpreted to bar coverage only for "the named insured's ownership, custody or care" of a pit bull, an interpretation that would result in coverage for Hernandez "because he neither owned nor had custody of Bugzy, nor did he care for the dog." Plaintiffs additionally argued Castaneda's fourth cause of action (for negligence of owners or possessors of residential real property—in essence, for premises liability) pled a potentially covered claim against Hernandez based on his failure to "control the premises."

While the motion was pending, the Second Appellate Division decided *Dua v. Stillwater Ins. Co.* (2023) 91 Cal.App.5th 127 (*Dua*). The trial court allowed the parties to submit supplemental briefing on *Dua*. It then issued a minute order finding the pit bull ownership exclusion to be unambiguous and applicable to Castaneda's injuries, and concluding there was no potential for

6

coverage of Castaneda's claims against Hernandez.  It granted the summary judgment motion and entered judgment in favor of the Exchange.

## DISCUSSION

Plaintiffs contend summary judgment was improperly granted because (1) the policy exclusion pertaining to injuries arising out of ownership of, custody of, or care for a pit bull is fatally ambiguous; (2) the allegations of the fourth cause of action in Castaneda's complaint asserted a potentially covered claim against Hernandez; and (3) *Dua* compels reversal of the summary judgment.  We conclude plaintiffs' arguments lack merit and summary judgment was properly granted.

## I.

### *Legal Principles*

#### A.     *Standard of Review*

"Summary judgment is appropriate if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Dua, supra,* 91 Cal.App.5th at p. 135 [cleaned up].)  Where, as here, the material facts are undisputed, the interpretation of an insurance policy presents a question of law.  (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 (*Haynes*).)

#### B.     *Duty to Defend*

Plaintiffs contend that notwithstanding the pit bull exclusion in Hernandez's homeowner's policy, the Exchange had a duty to defend Hernandez in the *Castaneda* action.  "The duty to defend is contractual.  A

7

liability insurer owes a broad duty to defend its insured against claims that create a *potential* for indemnity." (*Dua, supra*, 91 Cal.App.5th at p. 136, italics added [cleaned up].) "To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300.)

"The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy. The duty to defend arises under the facts alleged, and any doubts are resolved in favor of the insured." (*Dua, supra*, 91 Cal.App.5th at pp. 136–137 [cleaned up].)

C.     *Insurance Policy Interpretation*

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 (*Bank of the West*).) "Thus, the mutual intention of the parties at the time the contract is formed governs interpretation. If possible, we infer this intent solely from the written provisions of the insurance policy." (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 (*Palmer*) [cleaned up].) The provisions of an insurance policy "must be interpreted in context, giving effect

8

to every part of the policy with 'each clause helping to interpret the other.' " (*Dua, supra*, 91 Cal.App.5th at p. 136.)

"If the policy language 'is clear and explicit, it governs.' " (*Palmer, supra*, 21 Cal.4th at p. 1115.) On the other hand, " '[a] policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' " (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 *(Foster-Gardner)*.) However, mere "disagreement concerning the meaning of a phrase, or the fact that a word or phrase isolated from its context is susceptible of more than one meaning," does not make the word or phrase ambiguous. (*Ibid.* [cleaned up].) The " 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " (*Bank of the West, supra,* 2 Cal.4th at p. 1265, italics omitted.)

"The insured has the initial burden of showing that a claim falls within the scope of coverage, and a court will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage." (*Dua, supra*, 91 Cal.App.5th at p. 136 [cleaned up].) "But the burden is on the insurer to show the claim falls within an exclusion to coverage, and exclusions are narrowly construed." (*Ibid.*) "An insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 *(MacKinnon)* [cleaned up].) Thus, to be enforceable, "any provision that takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain and clear.' " (*Haynes, supra*, 32 Cal.4th at p. 1204.) A

limitation on coverage "must be stated precisely and understandably, in words that are part of the working vocabulary of the average layperson," and the burden to make coverage exclusions "conspicuous, plain and clear rests with the insurer." (*Ibid.*)

## II.

### *The Pit Bull Exclusion Is Not Fatally Ambiguous*

The parties do not dispute that Castaneda's complaint is potentially covered by the personal liability provision of Hernandez's homeowner's policy. But they dispute whether the pit bull exclusion is unambiguous (that is, clear) and therefore effective in withdrawing coverage of Castaneda's claims against Hernandez despite the fact he did not personally own, have custody of, or care for the pit bull that caused Castaneda's injuries.

Plaintiffs contend the pit bull exclusion is "fatally ambiguous" because it fails to specify whose ownership of, custody of, or care for the injury-causing pit bull will bring a claim within the scope of the exclusion. (Boldface omitted.) They argue that without such specification, the exclusion can be interpreted to mean ownership, custody, or care of a pit bull "by the person seeking coverage," an interpretation that would result in coverage for Hernandez. They contend *Essex Ins. Co. v. City of Bakersfield* (2007) 154 Cal.App.4th 696 (*Essex*) supports their position.

The Exchange, on the other hand, contends the exclusion is not limited to the person seeking coverage and instead applies when anyone engages in the excluded conduct. It argues that plaintiffs' interpretation of the exclusion as applying to "the person seeking coverage" is not reasonable because it is contrary to the provision's plain language when interpreted in the context of the policy as a whole. It points to several cases in which courts have found similarly worded exclusions to be unambiguous in precluding coverage

10

regardless of whether the particular insured seeking coverage was the person who engaged in the conduct that triggered the exclusion.  (See *Castro v. Allstate Ins. Co.* (S.D. Cal. 1994) 855 F.Supp. 1152 (*Castro*) [applying California law]; *Zelda, Inc. v. Northland Ins. Co.* (1997) 56 Cal.App.4th 1252 (*Zelda*); *Century Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121 (*Century Transit*); *Farmers Ins. Exch. v. Superior Court* (2013) 220 Cal.App.4th 1199 (*Farmers*).)

For several reasons, we find the Exchange's arguments to be persuasive and conclude the exclusion is unambiguous in withdrawing coverage of injuries arising out of the ownership of, custody of, or care for a pit bull, whether or not the owner, custodian, or caregiver is the same person as the person seeking coverage.

First, an essential difficulty with plaintiffs' position is their failure to establish that the interpretation of the exclusion that affords coverage to Hernandez is reasonable.  (See *MacKinnon*, *supra*, 31 Cal.4th at p. 655 [coverage must be afforded to the extent there is a "reasonable interpretation under which recovery would be permitted"].)  An insurance provision is ambiguous only " 'when it is capable of two or more constructions, both of which are reasonable.' " (*Foster-Gardner, supra,* 18 Cal.4th at p. 868.)  "The mere fact that a word or phrase in a policy may have multiple meanings does not create an ambiguity." (*Palmer, supra,* 21 Cal.4th at p. 1118.)  "To the contrary, a word with a broad meaning or multiple meanings may be used for that very reason—its breadth—to achieve a broad purpose." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 868.)  Further, we cannot determine ambiguity in the abstract but instead must construe the policy as a whole.  (*Palmer*, at p. 1118.)

11

Plaintiffs' interpretation of the pit bull exclusion as limited to injuries arising from ownership of a pit bull "by the person seeking coverage" finds no support in the plain language of the exclusion itself, which broadly states the policy does not cover "[b]odily [i]njury or property damage arising out of *the* ownership of, custody of, or care for . . . [*a*]*ny* pit bull type of dog." (Italics added.) Nor does the policy as a whole reveal an intent to limit the pit bull exclusion in the manner advocated by plaintiffs. The pit bull exclusion appears in a list of 15 exclusions (exclusions "a" through "o") consisting of categories of bodily injury or property damage that the policy "do[es] not cover." Nine of the exclusions, including the one at issue here, apply to bodily injury or property damage arising out of specified conduct (e.g., "the ownership . . . of motor vehicles," "the ownership . . . of aircraft," war, "the rendering or failing to render professional services," and "sexual misconduct"), without limitation. The remaining exclusions apply to bodily injury or property damage arising out of specified conduct (e.g., intentional acts, "the . . . sale . . . of any drug," and "the transmission . . . of any disease") but only when committed by "any insured." (Boldface and italics omitted.)

Neither the policy's personal liability coverage provision, defense of suit provision, nor *any* of its exclusions include the words "the person seeking coverage" (or any of its variants, such as "the insured" or "the insured seeking coverage"). Plaintiffs' interpretation of the pit bull exclusion as impliedly incorporating this phrase is therefore not grounded in or consistent with the policy as a whole. To adopt plaintiffs' interpretation, we would have to insert the missing words into the exclusion despite the lack of evidence this was what the parties intended. To do so would violate the rule that courts, in interpreting instruments, may not "insert what has been omitted." (Code Civ. Proc., § 1858; see *California Traditions, Inc. v. Claremont Liability Ins.*

12

*Co.* (2011) 197 Cal.App.4th 410, 418 ["Courts may not rewrite the insurance contract or force a conclusion to exact liability where none was contemplated." (Cleaned up.)].)

Second, in the cases cited by the Exchange, multiple courts held similarly worded exclusions to be unambiguously broad in withdrawing coverage, whether or not the insured seeking coverage was the person who committed the excluded conduct. For example, in *Century Transit*, after a cab driver beat two men with a flashlight, the victims sued the driver and his employer, alleging claims for assault and battery as well as a claim against the employer for negligent hiring, supervision and retention of the driver. (*Century Transit, supra,* 42 Cal.App.4th at p. 124.) The employer's general liability policy contained an exclusion withdrawing coverage for " '*any claim . . . based on assault and battery*[.]' " (*Id.* at p. 126.) The appellate court stated it could "find no ambiguity in this language." (*Ibid.*) It reasoned the language "places the focus not upon an insured's conduct or intent, but rather upon the type of event in which a plaintiff has sustained an injury" and concluded the exclusion could therefore only be construed "one way: a suit *based on assault and battery* is excluded no matter who commits it." (*Ibid.*; see also *Zelda, supra,* 56 Cal.App.4th at pp. 1260, 1261 [concluding, in the context of a lawsuit against a restaurant based on the restaurant employee's assault of a patron, that a policy endorsement withdrawing coverage for bodily injury or property damage " 'arising out of assault or battery' " "by its plain language, cover[ed] injury or damage arising when *someone* (*not necessarily an insured*) commits an act of assault or battery," (italics added)].)

Similarly, in *Castro*, a mother and son were insured under a homeowner's policy. After the son shot and killed someone at a public recreation center, the victim's family sued the mother for negligent

13

supervision. (*Castro*, *supra*, 855 F. Supp. at p. 1152.) The insurer declined to defend or indemnify the mother based in part on policy exclusions that withdrew coverage for injury or damage resulting from " '[a]n act or omission intended or expected to cause bodily injury or property damage' and from '[a] criminal act or omission.' " (*Id.* at p. 1154, fn. 2.) The district court, applying California law, rejected an argument these exclusions were "vague because they fail[ed] to clarify *whose* criminal or intentional acts are excluded from coverage." (*Id.* at p. 1154.) It reasoned: "[The insurer's] wholesale exclusion of coverage for injury or damage arising out of *any* criminal or intentional act broadens rather than restricts the scope of the exclusion. In short, [the insurer] explicitly excludes coverage for *all* criminal or intentional acts. It is the very absence of any qualification which clarifies rather than obscures the scope of the exclusion."[3] (*Id.* at pp. 1154–1155.)

---

[3] In *Castro*, the plaintiff also argued the criminal act exclusion was ambiguous for a second reason, namely that it "refer[red] to 'the insured' as the person to whom 'this exclusion applies.' " (*Castro, supra*, 855 F.Supp. at p. 1155.) The district court rejected this argument based on a joint obligations provision in the policy that stated, "The terms of this policy impose joint obligations on persons defined as an insured person. This means that the responsibilities, acts and failures to act of a person defined as an Insured Person will be binding upon another person defined as an Insured Person." (*Id.* at pp. 1153, 1155.) The court construed this provision as expressly imposing "joint liability for the criminal acts of an insured; that is, such conduct precludes coverage of any other insured under the policy." (*Id.* at p. 1155.)

Here, Hernandez's policy contains a virtually identical "JOINT OBLIGATIONS OF INSURED" provision. Although the Exchange partially relies on this provision in arguing the exclusion unambiguously withdrew coverage of Hernandez, contending the joint obligations provision "imputes" Dorian's ownership of Bugzy to Hernandez, we find it unnecessary to consider the merits of this position. Unlike the criminal act exclusion at issue in *Castro*, the exclusion in this case does not refer to " 'the insured' " as "the person to whom 'this exclusion applies.' " (See *Castro, supra,* 855

14

And in *Farmers*, a two-year-old girl was killed when she was accidentally run over by her grandfather in the driveway of his home. The child's mother and sisters filed a wrongful death action, alleging the grandfather was negligent in the operation of his pickup truck and the grandmother was negligent in supervising the child on the premises. (*Farmers*, *supra*, 220 Cal.App.4th at p. 1202.) The grandparents were insured under a homeowners policy that excluded from coverage injury resulting from " 'the ownership, maintenance, use, loading or unloading of . . . motor vehicles.' " (*Ibid*.) The insurer sought a judicial declaration that it was not obligated to provide coverage, in part on the ground the claims in the underlying action arose from the grandfather's use of a motor vehicle such that the motor vehicle exclusion precluded any potential coverage. (*Id.* at p. 1203.) The trial court denied the insurer's motion for summary adjudication, finding the grandmother's negligent supervision of the child " 'exist[ed] independently of the "use" of a motor vehicle' " and concluding the motor vehicle exclusion did not apply. (*Ibid*.)

Finding error, the Court of Appeal issued a writ of mandate directing the trial court to grant the motion. (*Farmers*, *supra*, 220 Cal.App.4th at pp. 1203, 1214.) The *Farmers* court first examined, and rejected, the trial court's conclusion that the grandmother's negligent supervision of the child and the grandfather's negligent vehicle use were independent concurrent proximate causes of the child's fatal injuries. (*Id.* at pp. 1208–1212.) It found "there was only one way, one place, and one time [the grandmother's]

_____

F.Supp. at p. 1155.) Instead, it broadly (and, as we conclude, unambiguously) withdraws coverage regardless of the identity of the pit bull owner, custodian, or caregiver. It is thus immaterial to the application of the exclusion whether one insured's ownership, custody, or care may be imputed to another insured by virtue of the policy's joint obligations provision.

15

negligence could give rise to liability: when [the grandfather] arrived home in his truck." (*Id.* at p. 1212.)

The *Farmers* court then considered the grandparents' alternative argument that the motor vehicle exclusion was ambiguous as to " 'whether the "use" of a motor vehicle must relate to an insured or some other,' " which the court interpreted as an argument the exclusion applied "only when the negligent supervision and the negligent use of the motor vehicle are by the 'same insured.' " (*Farmers, supra*, 220 Cal.App.4th at p. 1213.) The court held the exclusion was not ambiguous. It reasoned, in part, that "where an exclusion in an insurance policy 'discloses no suggestion that it relates exclusively to [specific types of] claims' but 'its language is broad and unqualified,' courts will not interpret it to apply only to those specific types of claims." (*Ibid.*, citing *Total Call Internat., Inc. v. Peerless Ins. Co.* (2010) 181 Cal.App.4th 161, 173 [holding nonconformity exclusion to be unambiguous, barring competitor claims, where it "discloses no suggestion that it relates exclusively to consumer claims" and "its language is broad and unqualified"].) The court found the motor vehicle exclusion "broad and unqualified" in that "it does not apply only to injury resulting from a particular insured's, or even any insured's, use of a motor vehicle." (*Farmers*, at p. 1213.) It reasoned that had the parties intended the exclusion "to apply only to injuries resulting from an insured's or a particular insured's 'ownership, maintenance, use, loading or unloading' of a motor vehicle, the policy would say so," as it did in the context of other exclusions. (*Ibid.*) Because "the policy distinguishes between exclusions that apply to conduct by an insured and those that apply to conduct by anyone, and the motor vehicle exclusion applies to motor vehicle conduct by anyone," application of the exclusion "does not require that

16

the negligent supervision and the negligent use of the motor vehicle be by the 'same insured.'" (*Ibid.*)

We agree with the Exchange these cases support the conclusion that Hernandez's policy is not ambiguous for failure to specify whose ownership of, custody of, or care for a pit bull triggers the exclusion. Again, the exclusion states the Exchange will not cover "[b]*odily* [*i*]*njury* or property damage arising out of the ownership of, custody of, or care for . . . [a]ny pit bull type of dog[.]" (Italics added.) The focus of the pit bull exclusion is thus on the claimed bodily injury and the manner in which it arose, and not on the identity of the person who owned, had custody of, or cared for the pit bull in question. Similar to the motor vehicle exclusion in *Farmers*, the exclusion uses the phrase "[i]njury . . . arising out of *the* ownership" (italics added) of a pit bull, language that is "broad and unqualified" in that "it does not apply only to injury resulting from a particular insured's, or even any insured's, [ownership of a pit bull]." (*Farmers*, *supra*, 220 Cal.App.4th at p. 1213.) Contrary to the plaintiffs' contention that the exclusion is ambiguous because it does not specify whose ownership, custody of, or care for the injury-causing pit bull triggers the exclusion, as the *Castro* court stated, "[i]t is the very absence of any qualification which clarifies rather than obscures the scope of the exclusion." (*Castro*, *supra*, 855 F.Supp. at pp. 1154–1155.)

Further, as in *Farmers*, the parties' policy contains exclusions that variously apply to injury arising from specified conduct when committed by "any insured" and to injury arising from specified conduct without limitation. Thus, similar to *Farmers*, the policy "distinguishes between exclusions that apply to conduct by an[y] insured and those that apply to conduct by anyone." (See *Farmers*, *supra*, 220 Cal.App.4th at p. 1213.) The similarities between the parties' policy and the policy at issue in *Farmers* support us in reaching

17

the same conclusion as in *Farmers*, namely, that "the [pit bull] exclusion applies to [ownership, custody, or care of a pit bull] by anyone, insured or noninsured." (See *ibid.*) Moreover, the exclusion is understandable and uses "words that are part of the working vocabulary of the average layperson." (*Haynes*, *supra*, 32 Cal.4th at p. 1204.) Accordingly, we conclude the pit bull exclusion is not fatally ambiguous but instead is clear and therefore effective in withdrawing coverage regardless of the identity of the person who engaged in the conduct described in the exclusion, and whether or not the person who owned, had custody of, or cared for the pit bull that caused the claimed injuries is the same person as the person seeking coverage.[4]

Plaintiffs contend we should not rely on the cases cited by the Exchange. They argue *Century Transit* and *Zelda* are inapposite because they involved exclusions that focused on a type of event—assault and battery—rather than ownership, custody, or care of a pit bull, which plaintiffs argue is focused on "human conduct." However, as the Exchange points out, *Century Transit* and *Zelda* involved a person's conduct, and the question at hand was whether that person's conduct precluded coverage for the insured under the exclusion in question. Thus, despite the difference, *Century Transit* and *Zelda* remain persuasive in their essential holdings, which is

---

[4]     Plaintiffs assert the Exchange initially claimed in its summary judgment motion that the pit bull exclusion withdrew coverage for anyone's ownership of, custody of, or care for a pit bull, while later claiming it only applied to Hernandez or Dorian's ownership, custody, or care of a pit bull, thus demonstrating ambiguity in the exclusion. However, the Exchange explains in response that it was not being inconsistent but was simply responding to plaintiffs' arguments. Regardless, as plaintiffs acknowledge, the salient issue for purposes of their appeal is whether they have advanced a reasonable interpretation of the exclusion. They have not, for the reasons we have already stated.

that an exclusion is not inherently ambiguous for failure to identify the person whose commission of the excluded injury-causing conduct withdraws the claim from coverage.

Plaintiffs also assert the part of the *Farmers* opinion that addressed the asserted ambiguity in the motor vehicle exclusion encompassed less than a page. Although this may be so, we nevertheless find the court's analysis to be persuasive.[5] Further, we disagree with plaintiffs' assertion the discussion in *Farmers* of the ambiguity in the motor vehicle exclusion was immaterial to the court's conclusion. The court was addressing plaintiffs' alternative argument for reversal of the summary judgment, such that its discussion constituted an independent ground for affirmance. (See *Bank of Italy Nat. Trust & Sav. Assn. v. Bentley* (1933) 217 Cal. 644, 650 [where two independent reasons are given for a decision, "neither one is to be considered mere *dictum*"].)

Last, to the extent plaintiffs rely on *Essex, supra,* 154 Cal.App.4th 696, we do not find *Essex* to be instructive under the circumstances of this case. *Essex* involved a commercial general liability (CGL) policy purchased by the City of Bakersfield to cover occurrences during a special event held on private property. (*Id.* at pp. 699, 701.) The property's driveway exited onto a state route. (*Ibid.*) A vehicle accident occurred on the state route when the driver of a tractor-trailer applied his brakes to avoid a van that was traveling past

---

[5] Plaintiffs also contend the *Farmers* court relied on a line of authority the *Essex* court distinguished. They cite *Farmers, supra,* 220 Cal.App.4th at page 1213 and *Essex, supra,* 154 Cal.App.4th at pages 708 to 709 for this proposition. However, the cited pages of these decisions do not support plaintiffs' contention; the authorities distinguished in *Essex* are not among those relied upon by the *Farmers* court.

the driveway.  (*Id.* at pp. 699–700.)  The tractor-trailer jackknifed into oncoming traffic and collided with the victim's automobile.  (*Ibid.*)

The victim and her family filed a lawsuit in which they alleged, in part, that the city had created a dangerous condition that contributed to the traffic accident.  (*Essex, supra*, 154 Cal.App.4th at p. 701.)  The city tendered its defense and indemnity to the CGL insurer, which denied coverage.  Whereas the main policy's original auto exclusion withdrew coverage for "bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any . . . auto . . . owned or operated by or rented or loaned to any insured," the exclusion had been modified by an endorsement to withdraw coverage for "bodily injury or property damage arising out of, caused by or contributed to by the ownership, non-ownership, maintenance, use or entrustment to others of any auto."  (*Id.* at pp. 701, 702 [cleaned up].)  The policy also included a special events endorsement that withdrew coverage for bodily injury arising out of " 'automobiles.' "  (*Id.* at p. 702, italics omitted.)  In the ensuing coverage action, the insurer filed a summary judgment motion in which it took the position it was not obligated to defend or indemnify the city pursuant to the auto exclusions in the endorsements.  (*Id.* at pp. 702–703.)  The trial court granted the motion.

The *Essex* court reversed, concluding the insurer's interpretation of the auto exclusions converted them into "unusual and unfair" limitations that defeated the city's reasonable expectation of coverage.  (*Essex, supra*, 154 Cal.App.4th at p. 706.)  Whereas the insurer "interprets these exclusions to limit coverage in any cases involving automobiles by anyone anywhere," the court stated, "no average layperson would have understood the auto exclusions in that manner."  (*Id.* at p. 707.)  Whereas the original auto exclusion was limited to automobiles " 'owned or operated by or rented or

20

loaned to *any insured*,' " in the court's view the subsequent modifications "d[id] not plainly and clearly provide that there would be no coverage for cases involving autos that have no connection to the insured." (*Ibid.*, italics added.) The court reasoned the modifications could reasonably be understood to have essentially the same meaning as the original language. (*Ibid.*) Further, the auto exclusion in the special events endorsement was "so vague" an average layperson would understand it as "repetitive of the auto exclusion in the main insurance form with the possible inclusions of acts of spectators on the insured premises." (*Ibid.*) "Thus, an average layperson would interpret the auto exclusions as applying to lawsuits involving the use of or other acts relating to any 'auto' *by any insured* or on the insured premises." (*Id.* at pp. 707–708, italics added.)

Moreover, the *Essex* court noted, when read in context with the other exclusions in the policy, it was reasonable to deduce that the auto exclusions were meant to apply only to cases involving acts of the insured or its agents. (*Essex*, *supra*, 154 Cal.App.4th at p. 708.) Specifically, the court observed the policy also excluded coverage for "acts done by employees in the course and scope of employment," and reasoned that the exclusion for injuries caused by autos could therefore be interpreted "to exclude all *such* acts and omissions, as well as certain occurrences by spectators and third parties taking place on the premises of the events." (*Ibid.*, italics added.) However, the automobiles involved in the underlying lawsuit "had no connection to any insured"; the accident did not take place on the insured premises; and there was "not even any evidence that the drivers or automobiles involved were going to or leaving from the insured premises." (*Ibid.*) Thus, the city was reasonable in expecting that the insurer would defend it from the suit. (*Ibid.*)

21

We are not persuaded by plaintiffs' reliance on *Essex*. Several of the circumstances that motivated that court's decision simply are not present here. Unlike *Essex*, the exclusion at issue in this case was never modified. It never included limiting language consistent with plaintiffs' current coverage position, and there is no subsequent endorsement that we can interpret as consistent with the original limitation. Unlike *Essex*, the policy's other exclusions are not limited to situations involving only the insured or the insured's agents. Instead, as we have mentioned, most of the exclusions lack any such limitation. Unlike *Essex*, it is not the case that the pit bull that caused Castaneda's bodily injuries has "no connection to *any insured*." (*Essex*, *supra*, 154 Cal.App.4th at p. 708, italics added.) Just the opposite. Bugzy was owned by Dorian, who was Hernandez's sister and tenant as well as an insured under the policy. For these reasons, we do not find the reasoning of *Essex* to be applicable, nor does it persuade us the pit bull exclusion is ambiguous in the context of the policy as a whole or the circumstances of this case.[6]

---

[6] Plaintiffs characterize *Essex* as holding "there was no *relevant* connection between the city and the automobiles involved in the crash that would trigger the Auto Exclusion." This is inaccurate: *Essex* did not use the phrase "relevant connection"; rather, it repeatedly found "no connection" between the vehicles involved in the accident and the city or "any insured." (*Essex*, *supra*, 154 Cal.App.4th at pp. 707, 708, 710.) We therefore decline to read the phrase "relevant connection" into the *Essex* decision.

Plaintiffs further contend that *Penn-Star Insurance Company v. Zenith Insurance Company* (9th Cir., Dec. 28, 2022, No. 21-16930) 2022 WL 17974449, in which the Ninth Circuit distinguished *Essex* on the basis that the auto exclusion before it (which specifically applied to the use of " 'any' auto 'by any person' ") contained different language than the auto exclusion in *Essex*, confirms the applicability of *Essex* to this case. We disagree. The fact that another court distinguished *Essex* on the basis of a third, dissimilar exclusion does not demonstrate that the exclusion before us falls within the holding of *Essex*.

And while Hernandez contends he "would not expect" the exclusion to withdraw coverage for the claims against him since he did not personally own, have custody of, or care for Bugzy, for the reasons we have explained, this subjective expectation does not comport with the explicit terms of the policy. The exclusion states the Exchange does not cover bodily injuries arising out of "*the* ownership of, custody of, or care for" a pit bull, not "*your* ownership," or ownership by "the insured" or "the person seeking coverage." (Italics added.) Because the policy's language is clear and unequivocal in excluding coverage of injuries arising out of the ownership, custody, or care of a pit bull, and Castaneda's injuries undisputedly arose out of Dorian's ownership, custody, or care of a pit bull, Hernandez could not reasonably expect coverage. (See *TIG Ins. Co. of Michigan v. Homestore, Inc.* (2006) 137 Cal.App.4th 749, 755 [" '[W]here the policy is clear and unequivocal, the only thing the insured may "reasonably expect" is the coverage afforded by the plain language of the mutually agreed-upon terms.' "].)

Further, to the extent plaintiffs argue Castaneda's claims against Hernandez were "groundless," they do not identify a basis for potential coverage. True, the policy states the Exchange will defend suits "claiming damages for bodily injury . . . *to which this coverage applies*" and that it will do so "*even if* the allegations are groundless, false or fraudulent." (Italics added.) However, the "duty to defend groundless actions applies only to claims covered by the policy." (*Venoco, Inc. v. Gulf Underwriters Ins. Co.* (2009) 175 Cal.App.4th 750, 765.) "In other words, this clause does not require the insurer to defend a noncovered claim *merely because* it is groundless." (Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group, 2023) ¶ 7:523.3, p. 13, citing *North American Building Maint., Inc. v. Fireman's Fund Ins. Co.* (2006) 137 Cal.App.4th 627, 639–640 ["While

23

an insurer must defend any claim that would be covered if true, even though the claim is in fact false . . . , an insurer has no duty to defend a noncovered claim even if the claim is false." (Citations omitted.)].) Castaneda's complaint alleged that both Hernandez and Dorian "were the owners, keepers, and harborers" of the dog that injured her. That the allegations against Hernandez may have been groundless is not sufficient to create a potential for coverage, because the allegations would not "be covered if true" since they fell within the pit bull exclusion. (*North American Building Maint.*, at pp. 639–640.)

## III.

### *There Is No Potential for Coverage of Castaneda's Fourth Cause of Action Against Hernandez*

Plaintiffs contend Castaneda's fourth cause of action for negligence of owners or possessors of residential real property asserts a potentially covered claim against Hernandez based on his negligent control of "his premises." (Boldface omitted.) For two reasons, we disagree.

First, plaintiffs' contention is based on an untenable reading of the complaint. In support of the fourth cause of action, Castaneda alleged "[Hernandez and Dorian] and each of them were the owners, lessors, and managers of the premises where the [d]og bit plaintiff" and "[Hernandez and Dorian] and each of them possessed the right, authority, means and opportunity to control *the premises and the* [d]*og*, and thereby to have prevented the [d]og from inflicting bodily injuries on plaintiff[.]" (Italics added.) Citing *Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 775–776, plaintiffs assert the terms "and" and "or" may be construed interchangeably, and that the italicized allegation may therefore be interpreted in the disjunctive as seeking to impose liability on Hernandez

24

based solely on his control of "the premises," and on Dorian based solely on her control of "the [d]og." However, *Universal Sales*, a case interpreting a contract that allocated patent rights over food pellet machines, simply does not stand for the proposition that the words "and" and "or" in a pleading are interchangeable. (See *id.* at pp. 775–776 [rejecting claim of error based on trial court's declaration of an interest in patents on "machines *and* improvements" on the ground " 'it was within the province of the trial court to construe the contract from a reading of the whole thereof' "].)

Second, even if the fourth cause of action could be interpreted as seeking to impose liability on Hernandez based solely on his control of "the premises," the Exchange still would have no duty to defend him against this claim. This conclusion is compelled by our determination that the policy exclusion unambiguously withdraws coverage of bodily injuries arising out of the ownership of, custody of, or care for a pit bull, regardless of whether Hernandez or Dorian was the owner, custodian, or caregiver. This is because any premises liability of Hernandez would not be a cause of Castaneda's injuries that existed independent of the ownership of Bugzy.

*State Farm Mut. Auto Ins. Co. v. Partridge* (1973) 10 Cal.3d 94 provides the standard that governs this issue. In *Partridge*, the defendant filed down the trigger mechanism of his gun so it would have a " 'hair trigger action.' " (*Id.* at p. 97.) While driving off road in his four-wheel drive vehicle, he hit a bump, and the pistol discharged and hit one of the vehicle's passengers. (*Id.* at p. 98.) The defendant was insured under automobile and homeowners policies; the homeowners policy excluded coverage for bodily injury " 'arising out of the . . . use of . . . any motor vehicle.' " (*Id.* at p. 99.) The insurer conceded that if the gun had accidentally fired while the insured was walking down the street or running through the woods, the resulting injuries would

25

be covered by the policy.  (*Id.* at p. 103.)  It argued, however, there was no coverage because the injuries arose out of the use of a motor vehicle.  (*Ibid.*)  Our high court disagreed and held the defendant's use of the vehicle was "only one of two joint causes of the accident" (*id.* at p. 102), the other being the defendant's modification of the gun (*id.* at p. 103).  The Court stated, "[I]nasmuch as the liability of the insured arises from his non-auto-related conduct, and exists independently of any 'use' of his car, we believe the homeowner's policy covers that liability."  (*Ibid.*)

Here, unlike the scenario in *Partridge*, even if Castaneda's complaint could be interpreted to assert a claim against Hernandez based only on his failure to "control the premises," Hernandez's liability under this claim would not exist independently of "the ownership of, custody of, or care for" Bugzy.  Plaintiffs posit that Hernandez could have been held liable for failing to instruct Dorian not to walk her dog off-leash, or for neglecting to maintain a working fence or gate "to prevent Bugzy from escaping from the premises."  But these illustrations prove our point:  none of these theories of liability can be divorced from Dorian's ownership, custody, or care of Bugzy.

The decisions of other appellate courts are instructive.  For example, in *Safeco Ins. Co. v. Gilstrap* (1983) 141 Cal.App.3d 524, 530 (*Safeco*), the Court of Appeal applied *Partridge* to a case arising from insured parents' negligent entrustment of a motorcycle to their 14-year-old son, who collided with another motorcycle and injured a third party.  (*Id.* at pp. 526, 527.)  The insurer argued a motor vehicle exclusion withdrew coverage, and the appellate court agreed.  It reasoned "the injury here involved no instrumentality other than the vehicle itself and . . . there would have been no accident without the use or operation of the motorcycle[.]"  (*Id.* at pp. 530–531.)  "In short, when the events giving rise to the insured's liability are

solely and indivisibly related to the use of an excluded instrumentality, coverage is precluded." (*Id.* at p. 530.)

And in *Farmers*, *supra*, 220 Cal.App.4th at pages 1204 through 1212, the underlying claim arose from the accident in which the grandfather ran over his granddaughter with his pickup truck. There, the appellate court considered whether the grandfather's negligent operation of his truck and the grandmother's negligent supervision of the child were dependent or independent concurrent causes of the child's fatal injuries. (*Id.* at p. 1208.) It determined the causes were not independent, and that the homeowner's policy exclusion for injuries arising from use of a motor vehicle therefore applied. It explained that in cases in which exclusions have been held to bar coverage, the excluded instrumentality "played an active role in causing the injury," and the injury " 'involved no instrumentality other than the vehicle itself,' and 'there would have been no accident without the use or operation of" the vehicle." (*Id.* at p. 1209, quoting *Safeco, supra,* 141 Cal.App.3d at p. 530.) The court found the grandmother's "negligent supervision was not 'separate and independent' of [the grandfather's] negligent automobile use because there was only one way, one place, and one time [the grandmother's] negligence could give rise to liability: when [the grandfather] arrived home in his truck." (*Farmers,* at p. 1212.)

Similarly, here, under the theories of premises liability posited by plaintiffs, it remains the case the excluded instrumentality, Bugzy, "played an active role in causing" Castaneda's injuries, and her injuries " 'involved no instrumentality other than [the pit bull] itself.' " (*Farmers, supra*, 220 Cal.App.4th at p. 1209; see *Safeco, supra*, 141 Cal.App.3d at pp. 530–531.) Much as in *Farmers*, it is not possible to construct a theory of liability under which Hernandez's alleged negligent control of his premises could have

caused Castaneda's injuries " 'separate and independent' " of Dorian's ownership, custody, or care of Bugzy. (*Farmers*, at p. 1212.) Instead, as in *Farmers*, there was only one way, one place, and one time Hernandez's negligence could give rise to liability: when Dorian allowed Bugzy to run off-leash in the park. (See *ibid.*) Consequently, Castaneda's fourth cause of action did not give rise to potential coverage based on Hernandez's failure to "control" his premises.

IV.

### Dua *Does Not Compel Reversal of the Judgment*

Finally, plaintiffs contend that *Dua, supra*, 91 Cal.App.5th 127 compels reversal of the judgment. We disagree.

*Dua* involved a third-party lawsuit that arose from a pit bull attack, but it involved an animal exclusion that differed from the exclusion at issue here. Dua was the named insured under a homeowner's policy with an animal liability exclusion that withdrew coverage for " 'damages caused by any animal, at any time, at any premises insured hereunder, or caused by, arising out of, or in any way related to any animal owned by or in the care, custody, or control *of the insured, or any member of the insured's family or household.*' " (*Dua, supra*, 91 Cal.App.5th at p. 132, italics added.) In the third-party lawsuit, a husband and wife sued Dua and her boyfriend for personal injuries and property damage allegedly caused when the boyfriend's pit bulls attacked the husband and wife's dogs on a public street. (*Id.* at p. 133.) As to Dua, the complaint alleged she was liable because she "had a 'duty of care' to take measures to prevent the attack and did not do so." (*Ibid.*)

When Dua tendered her defense to the insurer, she told the insurer that "her boyfriend, Taylor, had been walking his dogs when they attacked

the [husband and wife's] dogs, and that Taylor was the owner of the dogs." (*Dua, supra*, 91 Cal.App.5th at pp. 133–134.) The insurer denied coverage without conducting a further investigation. (*Id.* at p. 134.) Dua settled the lawsuit and sued the insurer for breach of contract and bad faith. She asserted that if the insurer had investigated, it would have discovered "(1) she was not married to Taylor; (2) Taylor did not live with her nor was he staying with her at the time of the dog attack; (3) the attack did not occur on her premises; and (4) at the time of the dog attack, the dogs were leashed and under the care, custody, and control of Taylor." (*Ibid.*) The trial court granted summary judgment for the insurer, concluding there was " 'no possibility that [Dua] could be found liable on facts that would have required [the insurer] to indemnify her.' " (*Id.* at p. 135.)

The Court of Appeal reversed. It reasoned the insurer "ignored the facts provided by Dua suggesting that the policy's animal exclusions did not apply because she did not own the dogs, nor were they in her care, custody or control." (*Dua, supra*, 91 Cal.App.5th at p. 137.) While the insurer argued that if Dua lacked ownership, custody, or control of the dogs, then there was no possibility she could be held liable under the complaint, the court disagreed this was a valid basis for denying her a defense. The court explained the husband and wife's claims, "when evaluated in light of the facts presented by Dua to [the insurer] when she tendered the claim, may have been frivolous and unmeritorious, *but did not come within the animal liability exclusion*. They thus created at least a possibility of coverage and the duty to defend." (*Id.* at p. 138, italics added.)

Justice Ashmann-Gerst authored a concurring opinion in *Dua* in which she agreed the trial court erred in granting summary judgment, although for a different reason. In her view, the insurer owed a duty to defend because

29

there was "the possibility that a court could have found Dua liable to the [husband and wife] under a novel theory premised upon Dua's alleged duty to take steps to prevent foreseeable injury and damage, such as by instructing her invited guests not to bring vicious animals to her home because it was reasonably foreseeable that the guests would walk the animals and that the animals would attack." (*Dua, supra,* 91 Cal.App.5th at p. 143 (conc. opn. of Ashmann-Gerst, J.).) "[S]uch a claim would not implicate the animal liability exclusion," she explained, "because it does not arise out of Dua's ownership, custody, control, or care of Taylor's dogs" and instead "would arise out of Dua's alleged ability to somehow control her invited guests." (*Id.* at p. 143, fn. 3.)

Plaintiffs rely on *Dua* in three respects. First, they assert *Dua* cannot be distinguished from this case, and suggest it therefore supports reversal of the judgment. This is clearly incorrect. Both the operative exclusion and the facts of *Dua* differ materially from those of the present case. In *Dua,* the exclusion applied to any animal " 'owned by or in the care, custody, or control *of the insured, or any member of the insured's family or household.*' " (*Dua, supra,* 91 Cal.App.5th at p. 132, italics added.) It was for this reason the husband and wife's claims fell outside the exclusion: the animals that caused their claimed damages were not owned by or in the care, custody, or control of *Dua or any member of her family or household.* This is unlike the exclusion in this case, which applied to injuries arising out of "*the* ownership of, custody of, or care for" a pit bull, without limitation, making *Dorian's* ownership, custody, or care of Bugzy sufficient to bring Castaneda's complaint for personal injuries within the exclusion. (Italics added.)

Second, plaintiffs contend the exclusion in *Dua* was clearer than the one in this case, thus demonstrating ambiguity in Hernandez's policy. We

are not persuaded. As we have discussed, numerous courts have found contractual language similar to the text of the exclusion in this case to be unambiguous. Further, plaintiffs cite no case in which a court has found an exclusion to be fatally ambiguous on the basis a different exclusion from a different insurance policy was clearer. Indeed, a leading treatise states, "Just because language could be more precise or explicit does not mean it is ambiguous." (Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group, 2023) ¶ 4:240, p. 48, citing *Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 103 ["Perfection in drafting is not required, and probably not even possible."].) The purpose of contractual language is to express the mutual intent of the parties (see *Bank of the West*, *supra*, 2 Cal.4th at p. 1264), and the parties in *Dua* evidently bargained for an exclusion that was simultaneously broader (because it encompassed "control" as well as ownership, custody or care of an animal, as opposed to a pit bull) and more limited (because it pertained only to the insured and the members of the insured's family or household) than the one at issue here. We decline to find the exclusion in this case ambiguous simply because its text differs from the one at issue in *Dua*.

Third, plaintiffs contend *Dua* supports the conclusion Castaneda's fourth cause of action for premises liability gave rise to potential coverage of Hernandez. They point to Justice Ashmann-Gerst's finding of a potential for coverage of Dua based on the theory she owed a duty to "control her invited guests." (See *Dua*, *supra*, 91 Cal.App.5th at p. 143, fn. 3 (conc. opn. of Ashmann-Gerst, J.).) They suggest that similar to the way this theory created a potential for coverage of Dua, Castaneda's fourth cause of action created a potential for coverage of Hernandez.

31

We disagree.  The theory of liability posited by Justice Ashmann-Gerst offered a potential for coverage in *Dua* because the exclusion in that case was limited (in relevant part) to animals "owned by . . . *the insured*," and the theory did not arise from *the insured's—Dua's—*ownership of the dogs.  (See *Dua, supra*, 91 Cal.App.5th at p. 133, italics added; *id.* at p. 143, fn. 3 (conc. opn. by Ashmann-Gerst, J.).)  Here, the exclusion is not so limited; it encompasses injuries arising out of "*the* ownership of, custody of, or care for" a pit bull, such that there was no potential for coverage of Castaneda's fourth cause of action regardless of whether her injuries arose out of Dorian's *or* Hernandez's ownership of, custody of, or care for Bugzy.  (Italics added.)  Moreover, as we have explained, any asserted negligence by Hernandez in his control of the premises was not a cause of Castaneda's injuries that existed independently of Dorian's ownership, custody, or care of Bugzy.

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


DO, J.


WE CONCUR:


McCONNELL, P. J.


KELETY, J.


32